United States Court of Appeals
Fifth Circuit

**F I L E D**

April 14, 2004

Charles R. Fulbruge III
Clerk

REVISED MAY, 17, 2004

In the

# United States Court of Appeals
## for the Fifth Circuit

m 02-10717

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

JULIUS OMAR ROBINSON,
ALSO KNOWN AS FACE, ALSO KNOWN AS SCAR, ALSO KNOWN AS SCARFACE,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, SMITH, and WIENER,
  Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Julius Robinson challenges his conviction and death sentence on several grounds, the most salient of which is that he was deprived of the Fifth Amendment right to stand trial only on crimes set forth in an indictment issued by a grand jury. The government concedes that the indictment is constitutionally deficient inasmuch as it fails specifically to charge the aggravating factors that render Robinson

eligible for the death penalty. The government contends, however, that the error is harmless.

Robinson also avers that the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 *et seq.*, is facially unconstitutional in three respects, that the district court abused its discretion in admitting evidence under the co-conspirator exception to the hearsay rule, and that his death sentence is predicated on improper aggravating factors. Agreeing with the government that the error in the indictment is susceptible to harmless error review, that on the facts of this case the error is harmless, and that none of Robinson's other claims has merit, we affirm.

I.

A.

Proving true to his Hollywood namesake, Robinson, also known by names such as "Scarface," entangled himself in a sadistic world of narcotics and violence in which he personally committed at least two senseless murders. In December 1998, RobinsonSSa wholesale drug dealer then operating in five statesSSkilled a man he mistakenly believed responsible for an armed hijacking that cost him $30,000. In May 1999, angered by a fraudulent drug transaction in which he paid $17,000 for a block of wood covered in sheetrock, Robinson retaliated by killing a man whose only connection to the fraud was that he was the brother-in-law of the fraudulent seller.

For these murders and his complicity in an ongoing criminal enterprise resulting in the murder of a third man, Robinson was convicted and sentenced to death on three separate counts, to life imprisonment on two others, and to a consecutive 300-month sentence on another. With one limited exception, Robin-

son challenges neither the sufficiency nor the admissibility of the evidence.

B.

The murder of Johnny Lee Shelton is a case of mistaken identity. Shelton was similar in appearance to a man named "Big Friday," whom Robinson blamed for a hijacking in a McDonald's restaurant parking lot several months before. On the night he was murdered, Shelton and a friend, Jerell Gardner, spent the evening at a Dallas night club, where they were spotted by two of Robinson's associates who mistook Shelton for Big Friday and called Robinson to tell him what they had seen.

Robinson quickly arrived at the club, whereupon he and two other men sat in a nearby parking lot, waiting for the man they thought was Big Friday to leave. They spotted Shelton and Gardner leaving the club in a car similar to the one Big Friday drove, and followed them onto a local highway. As they caught up to the car, Robinson yelled "that's him," leaned out the window, and opened fire with an AK-47 assault rifle. One of Robinson's companions, L.J. Britt, also known as "Capone," did the same. Although most of the bullets missed their mark, Shelton was struck in the stomach and later died.[1]

C.

Juan Reyes was shot to death at close range on the driveway in front of his home. He and two companions, Isaac Rodriguez and Nicholas Marques, arrived there on the day of the

---

[1] Those facts form part of the basis for Robinson's conviction and death sentence on counts 3 and 7, which charged violations of 21 U.S.C. § 848 and 18 U.S.C. § 924(j), respectively. The jury unanimously recommended a death sentence on both counts.

murder, not suspecting that in a car parked across the street were three men—including Robinson and Angelo Harris—who were upset that they had been sold a $17,000 block of wood instead of narcotics. Robinson and Harris approached Reyes carrying automatic weapons, said something to him—the record is unclear whether it was a demand for money—then shot him in the foot. Rodriguez, who had been standing nearby, turned to flee and was shot three times, in the back and leg.

Reyes fell to the ground and lay there as Robinson and Harris shot him at least nine times. An autopsy revealed fragments of concrete in several of Reyes wounds, suggesting he was shot from a distance of less than five feet, causing the bullets to pass through his body, ricochet off the pavement, and re-enter his back. Before leaving, Robinson and Harris also fired several shots at Marques, who was still seated behind the wheel in the car in which he, Reyes and Rodriguez had just arrived. Marques managed to drive around the corner to safety, but his car was riddled with bullets.[2]

### D.

Robinson also was convicted for involvement in a broad conspiracy that led to the murder of Rudolfo Resendez at the hands of Britt and Hendrick Tunstall. While engaged in this conspiracy, Robinson and other conspirators possessed more than five kilograms of cocaine and various firearms.[3] Robinson was further convicted of possessing three firearms in furtherance of a drug trafficking crime: a 9mm UZI pistol, a .357 caliber Smith & Wesson pistol, and an SKS 7.62x39 semi-automatic assault rifle.[4] Finally, he was convicted on several other drug and weapons charges that the district court treated as lesser included offenses and for which no independent sentence was imposed.

### E.

The jury's sentencing recommendation was based in part on (in addition to the aforementioned convictions) Robinson's criminal history. The jury learned of an incident in 1995 in which Robinson fired several shots from a handgun at a woman who had failed to pay him $120 for crack cocaine. This was used to show that Robinson had a violent record before the events charged in the indictment. The jury also was told of an incident, described in more detail in part IV, in which Robinson, acting from his jail cell after his arrest in this case, arranged to have a government informant murdered. This was used to show that Robinson had a propensity to commit future acts of violence.

---

[2] Those facts form part of the basis for Robinson's conviction and death sentence on counts 3 and 11, which charged violations of 21 U.S.C. § 848 and 18 U.S.C. § 924(j), respectively. The jury unanimously recommended a death sentence on both counts.

[3] Those facts form part of the basis for Rob-
(continued...)

[3](...continued)
inson's conviction on count 3 and his conviction and life sentences on counts 12 and 15, which charged violations of 21 U.S.C. §§ 848 and 841(a)(1) and 18 U.S.C. § 924(j), respectively. The jury—having separately recommended a death sentence for the portions of count 3 relating to the Shelton and Reyes murders—unanimously recommended a life sentence on the portion of count 3 related to Resendez and two other life sentences on counts 12 and 15.

[4] Those facts form the basis of Robinson's conviction and 300-month sentence on count 17, which charges a violation of 18 U.S.C. § 924(c)(1)(A).

## II.

As we have noted, the government concedes the indictment is constitutionally deficient because it fails to allege the statutory aggravating factors that make Robinson eligible for the death penalty. The government argues, however, that the error is harmless. Robinson responds by pointing to a line of cases that stand for the proposition that a conviction under an indictment constructively amended at trial is *per se* reversible error.

### A.

The conceded error arose only after the Supreme Court announced *Ring v. Arizona*, 536 U.S. 584 (2002). Before *Ring*, our analysis of the use of sentencing factors in a capital case was controlled by *Walton v. Arizona*, 497 U.S. 639, 648 (1990), wherein the Court determined that aggravating factors are not independent offenses, but only standards used to help a jury decide between death and life imprisonment.

The FDPA, 18 U.S.C. § 3593(d), imposes its own obligation on prosecutors to submit aggravating factors to the unanimous review of a petit jury but, consistent with *Walton*, it does not impose a concomitant obligation to have a grand jury first charge those factors in an indictment. Rather, the statute requires only that the government file a notice stating its intention to seek the death penalty and setting forth the aggravating factors on which it proposes to justify the death sentence. 18 U.S.C. § 3593(a). Here, the government filed such a notice setting forth several aggravating factors it had not presented to a grand jury.

Nineteen days after Robinson was sentenced using those factors, *Ring* was issued, expressly overruling *Walton*. The Court held that where an aggravating factor renders a de-

fendant eligible for death, it is "the functional equivalent of an element of a greater offense" and therefore must be proven to a jury beyond a reasonable doubt. *Ring*, 536 U.S. at 609 (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000)). As a new rule of constitutional criminal procedure, that holding applies to all cases pending on direct review, including Robinson's. *Griffith v. Kentucky*, 479 U.S. 314, 322 (1987).

*Ring*'s Sixth Amendment holding applies with equal force in the context of a Fifth Amendment Indictment Clause challenge, even though the Supreme Court has yet to hold as much in a capital case.[5] As a result, the government is required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant eligible for the death penalty, and its failure to do so in this case is constitutional error.[6]

---

[5] *See, e.g., Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) (holding that "any fact . . . that increases the maximum penalty for a crime must be charged in an indictment"); *Apprendi*, 530 U.S. at 476 (same); *United States v. Cotton,* 535 U.S. 625, 627 (2002) (same). *See also Sattazahn v. Pennsylvania,* 537 U.S. 101, 111 (2003) (opinion of Scalia, J.) ("We can think of no principled reason to distinguish, in this context, between what constitutes an offense for purposes of the Sixth Amendment's jury-trial guarantee and . . . the Fifth Amendment's Double Jeopardy Clause.").

[6] This holding is in accord with that of the other two circuits to have considered the issue. *See United States v. Allen*, 357 F.3d 745, 748 (8th Cir. 2004) (holding, in an FDPA case, that "aggravating factors essential to qualify a particular defendant as death eligible . . . must be alleged in the indictment"); *United States v. Higgs,* 353 F.3d 281, 298 (4th Cir. 2003) (same). At oral argument, the government represented that it became

(continued...)

4

### B.

We must consider whether *Apprendi* errorSShere the failure of an indictment specifically to charge aggravating factors regarded as elements because they increase the maximum available punishmentSSis susceptible to harmless error review. *Cf. Apprendi*, 530 U.S. at 490. The Supreme Court has not yet decided that question. Robinson points to a pre-*Apprendi* case, *Stirone v. United States*, 361 U.S. 212 (1967), to argue that the error is *per se* reversible.

Although *Stirone* deals with the marginally different problem of constructive amendments to an indictment, it contains strong language that informs our understanding of the gravity of the error in this case. In particular, *Stirone* specifies the "rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him" and adds that "[d]eprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error." *Id.* at 217.

*Stirone* notwithstanding, the error here is susceptible to harmless error review. In *Cotton*, 535 U.S. at 631, the Court resolved an analytically similar issue when it held that a defective indictment does not deprive the court of jurisdiction and that plain error review applies if the defendant fails to object. We

have interpreted *Cotton* also to require the application of harmless error review where an indictment is defective and the defendant preserves the error by proper objection. *United States v. Baptiste*, 309 F.3d 274, 277 (5th Cir.) (per curiam) (on petition for rehearing), *cert. denied*, 538 U.S. 947 (2003); *United States v. Matthews*, 312 F.3d 652, 665 (5th Cir.), *cert. denied*, 538 U.S. 938 (2003). Several other circuits likewise have concluded that where a defendant preserves an *Apprendi* indictment error, the claim is reviewed for harmless error.[7]

The conclusion that this type of error is susceptible to harmless error review follows from two considerations. First is *Neder v. United States,* 527 U.S. 1, 8 (1999), in which the Court noted that harmless error review applies in all but a limited class of cases involving "structural errors." Such cases "contain a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'" *Id.* (citation omitted). The Court illustrated the point by providing a list of cases in which a structural error was found; notably, the Court failed either to cite *Stirone* or to mention a defective indictment as being a structural error. *Id.*

Second, although *Cotton* dealt only with

---

[6](...continued) the policy of the Department of Justice, post-*Ring*, to seek, in all pending FDPA cases, superseding indictments setting forth the aggravating factors that render the defendant eligible for the death penalty. One of Robinson's co-defendants, Britt, was tried on the basis of one such superseding indictment, but the option was unavailable for Robinson, who was convicted and sentenced pre-*Ring*.

[7] Two circuits have reached this conclusion in FDPA cases. *See Allen*, 357 F.3d at 752; *Higgs*, 353 F.3d at 306. Three others have done so in non-capital cases. *See United States v. Mojica-Baez,* 229 F.3d 292, 311 (1st Cir. 2001); *United States v. Prentiss*, 256 F.3d 971, 984 (10th Cir. 2001) (en banc) (per curiam); *United States v. Anderson*, 289 F.3d 1321, 1327 (11th Cir.), *cert. denied*, 537 U.S. 1195 (2003).

plain error[8] and expressly reserved the question whether a defect in an indictment is structural error,[9] the Court's analysis suggests strongly that such a defect is not the sort of structural error that necessarily escapes harmless error review.

In applying the plain error test of *United States v. Olano*, 507 U.S. 725 (1993), the Court in *Cotton*, 535 U.S. at 631-32, was called on to consider whether the error affected substantial rights and whether it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. Rather than determine whether the defendant's substantial rights were affectedSSan inquiry consisting of determining whether the error affected the outcome of the proceedingsSSi.e., whether the error harmed the defendantSSthe Court held that "even assuming respondents' substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 632-33.

Given that conclusion, it is difficult to accept that the same error simultaneously could be the sort of "structural error" discussed in *Neder*, one that necessarily "deprive[s] defendants of basic protections without which . . . no criminal punishment may be regarded as fundamentally fair." *Neder*, 527 U.S. at 8-9. In addition, although *Cotton* acknowledges that "the Fifth Amendment grand jury right serves a vital function in providing for a body

of citizens that acts as a check on prosecutorial power," it also recognizes "that is surely no less true of the Sixth Amendment right to a petit jury, which, unlike the grand jury, must find guilt beyond a reasonable doubt." *Cotton*, 535 U.S. at 634.

We need not diminish the importance of the Fifth Amendment right to a grand jury indictment to conclude that the error at issue in *Neder*SSthe failure to include an element of the crime in petit jury instructionsSSis difficult to distinguish from the present one, and we find no compelling reason to carve out an exception to *Neder*'s harmless error rule for such an analytically similar claim.[10] As a result, the absence of an indictment on the aggravating factors used to justify a death sentence is not structural error and is susceptible to harmless error review.[11] *See Baptiste*, 309 F.3d at 277.

---

[8] And indeed, the Court specifically distinguished *Stirone* on the ground that defendant had preserved error by objecting. *Cotton,* 535 U.S. at 632.

[9] *Id.* (acknowledging defendant's argument that indictment errors are "structural errors," but deciding it need not resolve that claim).

[10] *See also Prentiss*, 256 F.3d at 984 ("[A] defendant's right to have a petit jury find each element of the charged offense beyond a reasonable doubt is no less important than a defendant's right to have each element of the same offense presented to the grand jury. If denial of the former right is subject to harmless error analysis, we believe denial of the latter right must be as well.").

[11] Robinson also argues for *per se* reversal by pointing to *United States v. Fletcher*, 121 F.3d 187 (5th Cir. 1997). Reliance on *Fletcher* is misplaced. As we explained in *United States v. Longoria*, 298 F.3d 367, 373-74 & n.9 (5th Cir.) (en banc) (per curiam), *cert. denied*, 537 U.S. 1038 (2002), *Fletcher* applied an analytical framework that the court "must change" post-*Cotton*. Rather than regarding the defendant as having been improperly sentenced under a valid conviction, as the court did in *Fletcher*, the correct approach in such cases is to treat the defendant as having been properly sentenced pursuant to an invalid conviction, and to determine only whether the use of an

(continued...)

6

C.

To decide whether the error is harmless on the facts of this case, we use the test announced in *Chapman v. California*, 386 U.S. 18 (1967), because it is constitutional error. *See Neder*, 527 U.S. at 15. The question is whether the error affects substantial rights. FED. R. CRIM. P. 52(a). That is to say, we inquire whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 23. "An otherwise valid conviction will not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

Relevant to the inquiry in the present case, the two primary functions of an indictment are that it (1) provides notice of the crime for which the defendant has been charged, allowing him the opportunity to prepare a defense, *see Russell v. United States*, 369 U.S. 749, 763-64 (1967); and (2) interposes the public into the charging decision, such that a defendant is not subject to jeopardy for a crime alleged only by the prosecution, *see Stirone*, 361 U.S. at 218. Robinson received adequate independent notice of the intention to pursue a death sentence using the aggravating factors that were ultimately presented to the jury. The FDPA requires the government

> a reasonable time before the trial . . . [to] sign and file with the court, and serve on the defendant, a noticeSS (1) stating that the government believes that the circumstances of the offense are such that . . . the government will seek the sentence of death;

and (2) setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.

18 U.S.C. § 3593(a). The government complied by filing notice four months before trial, and Robinson does not contend that the content or timing of the notice left him unable to prepare a defense.

More difficult is the question whether Robinson was harmed by losing the right to have the public determine whether there existed probable cause to charge the aggravating factors used to sentence him to death. The courts have long recognized the significant value the public adds to our system of justice through its involvement in grand jury proceedings.[12] Once a trial takes place, however, there is little a court of appeals can do to restore to a defendant that which was lost: the right not to face a prosecution initiated solely at the government's behest. *United States v. Mechanik*, 475 U.S. 66, 71 (1986).[13]

---

[12] *See, e.g.,Wood v. Georgia*, 370 U.S. 375, 390 (1962) ("Historically, this body has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.")

[13] "[T]here is no simple way after the verdict to restore the defendant to the position in which he would have been had the indictment been dismissed before trial. He will already have suffered whatever inconvenience, expense, and opprobrium (continued...)

---

[11](...continued)
incomplete indictment requires reversal. *Id.*

7

As a result, meaningful enforcement of this right always will depend, in the main, on the vigilance of the trial court and on its willingness to require that a defective indictment be amended before trial.[14] The error in this case lasted as long as it has only because the district court properly relied on the then-binding *Walton* decision. On appeal, our inquiry focuses solely on the question whether, on the basis of the evidence that would have been available to the grand jury, any rational grand jury presented with a proper indictment would have charged that Robinson committed the of-

---

[13](...continued)
that a proper indictment may have spared him." *Id.*

[14] In this respect, our view apparently differs from that of the Eighth Circuit in *Allen*. Though it ostensibly agreed that the harmless error rule applies, that court also expressed its concern that application of the harmless error doctrine would invite intentional government action to evade the Fifth Amendment's Indictment Clause, because it would render "indictment by information in all cases . . . constitutionally harmless error." *Allen*, 357 F.3d at 755.

To the contrary, an equally competent district court would catch such a glaringly obvious error as the failure to indict any defendant at all, so we do not subscribe to this doomsday prophesy. The Eighth Circuit's rebuttal to our position—that "there will be instances where errors occur or objections are not timely made," *id.* at 756—is unpersuasive. The same can be said of any instance in which harmless or plain error review applies, and it hardly describes a world in which the Fifth Amendment has no meaning. Harmless error is used only where objections are made but "errors occur," *see* FED. R. CRIM. P. 52(a); the failure to object timely causes the plain error doctrine to be invoked, *see* FED R. CRIM. P. 52(b); *Cotton*, 535 U.S. at 631.

fense in question. *Matthews*, 312 F.3d at 665.

The government asks us to embrace a categorical rule premised on *Mechanik*, to the effect that the petit jury's unanimous finding that the aggravating factors applied to Robinson beyond a reasonable doubt conclusively establishes that the grand jury—which operates *ex parte*, by majority vote, and without evidentiary restrictions—would have found probable cause to charge the aggravating factors as well.

In *Mechanik*, 475 U.S. at 70, the Court provided substantial support for the government's rule, inasmuch as it stated that although a procedural error before the grand jury

> had the theoretical potential to affect the grand jury's determination whether to indict these particular defendants for the offenses with which they were charged . . .[,] [t]he petit jury's subsequent guilty verdict means not only that there was probable cause to believe that the defendants were guilty as charged, but also that they are in fact guilty as charged beyond a reasonable doubt. Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt.

At oral argument, Robinson responded by arguing that the logic of *Mechanik*—which essentially posits that the citizens on the grand jury are interchangeable with those on the petit jury—has less force in a capital case, where the petit jury is subject to death qualification.[15]

---

[15] Robinson has not substantiated this claim with anything more than the conventional wisdom
(continued...)

8

No categorical rule is needed to convince us that any rational grand jury would find probable cause to charge Robinson with at least one of the statutory aggravating factors omitted from his indictment.[16] In addition to the petit jury's unanimous findingsSSwhich we consider to be, at a minimum, persuasive evidence of how a grand jury would findSSthe evidence overwhelmingly shows that there existed probable cause to charge Robinson with the aggravating factors used in his sentencing.

All three death sentences involved the aggravating factor that in the killings of Shelton and Reyes, Robinson "knowingly created a grave risk of death to one or more persons in addition to . . . the victim." *Cf.* 18 U.S.C. § 3592(c)(5). Robinson killed Shelton by firing an AK-47 assault rifle from the window of a moving vehicle on a public highway, directly endangering Shelton's passenger and anyone else in range.[17] The record also shows that in the course of killing Reyes, Robinson and his co-assailant managed to shoot Rodriguez three times and to fire enough times at Marques's car fleeing the scene to leave it riddled with bullets. All this took place in a residential neighborhood in close proximity to at least two adolescent eyewitnesses playing on a nearby porch, and across the street from a barbecue attended by at least ten people.

No rational grand jury would fail to find that this evidence constituted anything less than probable cause to believe that, in the course of committing each murder, Robinson created a grave risk of death to someone other than the victim. As a result, and beyond a reasonable doubt, the failure to charge those factors in an indictment did not contribute to Robinson's conviction or death sentence.[18] *Cf.*

---

[15](...continued) that a death-qualified jury is more apt to convict than is a random jury, a finding the Supreme Court has repeatedly disavowed in cases involving far greater evidence than we have before us. *See Lockhart v. McCree*, 476 U.S. 162, 168-73 (1986) (criticizing studies that purported to show a connection between death qualification and guilty verdicts, before concluding that even a "somewhat more 'conviction-prone'" jury would not violate the Sixth Amendment); *Witherspoon v. Illinois*, 391 U.S. 510, 517-18 (1968) (finding the evidence of the effect of death qualification to be "too tentative and fragmentary" to support the view that such jurors are more apt to convict).

[16] We agree with the Fourth and Eighth Circuits that it is only the statutory aggravating factors that trigger the Fifth Amendment's Indictment Clause, because they are the only factors that render the defendant eligible for death. *See Higgs*, 353 F.3d at 298; *Allen*, 357 F.3d at 749; 18 U.S.C. § 3593(e)(2).

[17] That evidence came in the form of testimony by Jason Gehring, the man driving the assailants' truck as they pursued Shelton. Gehring stated that Shelton's car accelerated rapidly moments before the shooting started and that Gehring could see a large number of bullets ricocheting off the road and adjoining concrete wall. This created an obvious risk of death to other motorists who could have been hit by a stray bullet or involved in an accident with Shelton's fast-moving vehicle.

[18] Although it suffices that the grand jury would have charged one statutory aggravating factor, there also is overwhelming evidence to support the remaining factors. For example, the Reyes and Shelton murders were committed after substantial planning and premeditation, a factor also used to impose the death penalty on counts 3, 7, and 11. *Cf.* 18 U.S.C. § 3592(c)(9). Witnesses testified that Robinson had repeated discussions over several weeks about getting even with Big Friday, the man he thought responsible for the hijacking. This was further evidenced by the fact that
(continued...)

*Chapman*, 386 U.S. at 23.

### III.

Robinson challenges the constitutionality of the FDPA on three grounds. First, he argues that the statute is facially unconstitutional under the Fifth Amendment's Indictment Clause because it does not require prosecutors to charge aggravating factors in an indictment; second, he reasons that the FDPA violates the Fifth Amendment's guarantee of due process of law; and he contends that the FDPA violates the Eighth Amendment's ban on cruel and unusual punishment. None of these claims has merit.

The constitutionality of a federal statute is a question of law reviewed *de novo*. *United States v. Ho*, 311 F.3d 589, 601 (5th Cir. 2002). "A statute must be construed, if fairly

---

[18](...continued)
Robinson's associates knew to call him as soon as they thought they saw Big Friday, and by Robinson's immediate response to that phone call. The Reyes murder occurred only after Robinson's co-assailant drove from Oklahoma to Dallas to participate in the shooting, and witnesses testified that the pair waited outside Reyes's house for up to twenty minutes before the victim arrived.

In addition, the evidence that Robinson riddled Reyes's body with bullets after he was on the ground provides probable cause to believe that the murder was committed in an especially heinous, cruel, or depraved manner, as used to support the death sentence for count 11. *Cf.* 18 U.S.C. § 3592(c)(6). Finally, the evidence that Robinson and his co-assailant fired on two other people at Reyes's home points overwhelmingly in favor of a finding that Robinson attempted to kill more than one person in a single criminal episode, as used to support the death sentence for count 11. *Cf.* 18 U.S.C. § 3592(c)(16).

possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (internal quotations omitted). "This canon is followed out of respect for Congress, which we assume legislates in the light of constitutional limitations." *Id.*; *see also United States v. Bird*, 124 F.3d 667, 678-79 (5th Cir. 1997).

### A.

"A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Id.*

The FDPA is not facially unconstitutional under the Indictment Clause. Although Robinson is correct to point out that nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment, he fails to note that there is nothing in that law inhibiting such a charge. The government can easily comply with both its constitutional obligations (by first going to the grand jury) and its statutory obligations (by later filing a § 3593(a) notice of intention to seek the death penalty). As a result, the statute is not facially unconstitutional.

### B.

Robinson's due process claim fails, as well. He argues, citing *United States v. Quinones*, 205 F. Supp. 2d 256 (S.D.N.Y.), *reversed*, 313 F.3d 49 (2d Cir. 2002), *cert. denied*, 124

S. Ct. 807 (2003), that the FDPA violates the substantive and procedural components of the Due Process Clause. The substantive due process claim is premised on the idea that all capital defendants share a liberty interest in not being executed for crimes they did not commit. This shared liberty interest, it is argued, entitles a guilty defendant facially to invalidate a law that could be used in some other case to execute an innocent man.

This argument has no merit. Whatever the risk that another person will be wrongfully convicted, Robinson has not even attempted to show, on appeal, that his conviction is erroneous, and he has presented no evidence to suggest that the FDPA is unconstitutional as applied to his case. So, he cannot invalidate the statute on the ground that it might conceivably be applied to reach an unconstitutional result in some other defendant's case. *Salerno*, 481 U.S. at 745.

Robinson does not elaborate on the specific manner in which he believes the FDPA deprives him of procedural due process. We presume, however, from his frequent citations to the district court opinion in *Quinones,* that he agrees with that court that the problem is that execution "arbitrarily eliminate[s] any possibility of exoneration after a certain point in time." *Quinones*, 205 F. Supp. 2d at 265.

On that theory, all executions would violate the Due Process Clause, because they render the defendant unable further to challenge his conviction. That argument is belied by the plain text of the Fifth Amendment, which unambiguously provides that some measure of process is sufficient to permit imposition of the death penalty, and there is nothing arbitrary in choosing, for the execution, a point in time after a full and fair trial, direct appeal, and the

opportunity to pursue relief in the form of a petition for a writ of certiorari and petition for a writ of habeas corpus.

C.

Robinson asks us to invalidate the FDPA on the ground that the death penalty is cruel and unusual punishment, in violation of the Eighth Amendment. He recognizes that this claim is foreclosed by *Gregg v. Georgia*, 428 U.S. 153 (1976), but he argues that societal standards of decency have evolved to the point at which imposing the death penalty against an adult murderer has become an intolerably cruel act. *Cf. Trop v. Dulles*, 356 U.S. 86, 101 (1958). We note, however, that it is uncertain whether this court is even empowered to recognize such an evolution in the law, or must instead reserve that question for the Supreme Court.[19] Even assuming we had such a power, Robinson presents no evidence of an evolution in societal standards of decency, and we see no reason to believe that there has emerged a national consensus against capital punishment for defendants who commit crimes that are as depraved as Robinson's. The FDPA is not facially unconstitutional under any of these theories.

IV.

Robinson challenges, as hearsay, the admission of certain testimony at his sentencing hearing. The government counters that the

---

[19] Recently, the Supreme Court granted *certiorari* in *Roper v. Simmons*, No. 03-633, in which the first question it certified for review is as follows: "Once this court holds that a particular punishment is not 'cruel and unusual,' and thus barred by the Eighth and Fourteenth Amendments, can a lower court reach a contrary decision based on its own analysis of evolving standards?" *Roper*, 124 S. Ct. 1171 (2004).

11

district court properly admitted the evidence as the testimony of a co-conspirator under rule 801(d)(2)(E) of the Federal Rules of Evidence, and on the ground that the FDPA explicitly provides that the rules of evidence do not apply at sentencing hearings. *See* 18 U.S.C. § 3593(c); *see generally* 5 STEPHEN A. SALTZBURG, MICHAEL M. MARTIN & DANIEL J. CAPRA, FEDERAL RULES OF EVIDENCE MANUAL § 1101.02[2], at 1101-5; 1101.03)[6][d] (LexisNexis 2003).

We "review the admission of hearsay evidence under the non-hearsay definition of Rule 801(d)(2)(E) for abuse of discretion." *United States v. Solis*, 299 F.3d 420, 443 (5th Cir.) (internal quotations omitted), *cert. denied*, 537 U.S. 1060, *and cert. denied*, 537 U.S. 1094 (2002). "Under our precedent, the proponent of admittance under Rule 801(d)(2)(E) must prove by a preponderance of the evidence (1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy." *Id.*

The evidence was admissible as a co-conspirator's statement, so we need not consider whether the FDPA's blanket exception to the hearsay rule is constitutional under *Ring*.[20] *See generally* 5 SALTZBURG ET AL., *supra*, § 801.03[10]; *cf.* U.S. CONST. amend. VI. The

objection was made to a portion of the testimony of Michael Williams, also known as "One Love," a government informant whose testimony was used to prove the non-statutory aggravating factor that Robinson posed a future danger to the lives and safety of other persons, as evidenced by a lack of remorse during or soon after the murder of Reyes.

At the sentencing hearing, Williams testified to the effect that, after aiding the investigation of Robinson, he was approached by three men, one of whom was armed with a .38 caliber firearm, who then kidnaped, assaulted, and threatened him with death. Over Robinson's objection, Williams testified that one of these men, Kendall Pitts, also known as "Cracker," told him the men were going to kill him because he had "snitched" on a gang leader.[21] This testimony easily fits the first three prongs of the rule 801(d)(2)(E) exception, because the government made a competent showing that Robinson initiated a conspiracy to have Williams murdered, that the declarant Pitts was involved in this conspiracy, and that the statement was made while Pitts carried out the conspiracy. *Cf. Solis*, 299 F.3d at 443.

As to the fourth requirement, "[t]his Court has consistently held that the in furtherance requirement is not to be construed too strictly lest the purpose of the exception be defeated." *United States v. Phillips*, 219 F.3d 404, 418-19 (5th Cir. 2000). It is sufficient, in this respect, that Pitts's declarationSSwhich was

---

[20] The constitutionality of rule 801(d)(2)(E) is well established. *See United States v. Inadi*, 475 U.S. 387, 395 (1986); *Bourjaily v. United States*, 483 U.S. 171, 182 (1987). As applied to the present case, this conclusion is not called into doubt by *Crawford v. Washington*, 124 S. Ct. 1354, 1374 (2004), because the statement challenged as hearsay was made during the course of the conspiracy and is non-testimonial in nature.

[21] The government separately linked this testimony to Robinson by introducing an audiotape of a phone conversation in which Robinson was heard, from jail, instructing a relative to "go hard" on Williams, and through testimony showing that outside sources wasted little time in informing Robinson of the attempt on Williams's life.

not only a threat but an explanation of why the threat was legitimate—put Williams under his immediate control as the three men forced him to go along to the location where they intended to kill him. The district court did not abuse its discretion in admitting this testimony.

## V.

Robinson makes two challenges to the aggravating factors used against him. First, he argues that two of the statutory aggravating factors used to support his death sentence under count 11—for the murder of Juan Reyes—are unconstitutionally duplicative. Second, he posits that the FDPA does not authorize the use of non-statutory aggravating factors. Both points are meritless.

## A.

There is no legal basis for Robinson's claim that two of the aggravating factors specified by Congress were used in such a way as to be unconstitutionally duplicative. Although our caselaw once framed the issue in those terms, the Supreme Court recently admonished that it does not support that theory of review. *See Jones v. United States,* 527 U.S. 373, 398 (1999). Rejecting the idea that a similarity between two factors could make their combined use invalid, the Court explained that it had only held that "the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor." *Id.* (citing *Stringer v. Black*, 503 U.S. 222, 232 (1992)).

Both factors challenged by Robinson are legitimate. Congress determined, in § 3592-(c)(5), that a murderer is deserving of greater condemnation if he knowingly created a grave risk of death to one or more persons in addition to the victim; and, in § 3592(c)(16), that greater condemnation is warranted if the per-

petrator intentionally killed or attempted to kill more than one person in a single episode. We see no reason to second-guess Congress's judgment that murders bearing those attributes are deserving of enhanced punishment, and under *Jones* their use is none the worse in tandem.

## B.

Robinson argues that the jury arrived at its recommendation of death by impermissibly weighing aggravating factors that were not specified by the statute. These "non-statutory aggravating factors" are considerations that the prosecution specified in its § 3593(a) notice of intent to seek the death penalty as additional reasons that Robinson should be put to death.[22] The statute provides that the jury may consider such determinations in reaching its decision to recommend death, just as it permits the jury to consider any mitigating factors not specified in the statute.[23]

Robinson's tortured reading of the statute would have us declare that § 3591(a) contradicts, and implicitly invalidates, the provision

[22] The government's notice indicated that it sought to prove that Robinson had committed a previous violent act and had exhibited a lack of remorse that was suggestive of propensity to commit a future violent act. The jury unanimously found beyond a reasonable doubt that those factors applied to Robinson, and presumably weighed them in reaching the recommendation that he be sentenced to death.

[23] *Compare* 18 U.S.C. § 3592(a) (stating that "the finder of fact shall consider any mitigating factor, including the following" eight specified factors); *with* § 3592(c) (stating that "the jury . . . may consider whether any other aggravating factor for which notice has been given exists").

13

authorizing the use of non-statutory aggravating factors merely because § 3591(a) refers to consideration of the factors "set forth" in § 3592(c). "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) (internal quotations omitted). When the statute is read as a coherent whole, the two provisions are not in tension, because § 3592 adequately "sets forth" the non-statutory aggravating factors by providing that the jury may consider them.

For the foregoing reasons, the conviction and sentence are AFFIRMED. The government's motion to supplement the record on appeal is DENIED.