**UNITED STATES of America,**

v.

**Darryl GREEN, Jonathan Hart, Edward Washington, Branden Morris, and Torrance Green, Defendants.**

**Crim.No. 02–10301–NG.**

United States District Court, D. Massachusetts.

June 2, 2005.

William C. Brennan, Jr., Brennan, Trainor, Billman & Bennett, LLP, Upper Marlboro, MD, Randolph M. Gioia, Law Office of Randolph Gioia, Boston, MA, Sarah Jennings Hunt, Cambridge, MA, Jeffrey B. O'Toole, Washington, DC, for Darryl Green, Defendant.

Christie M. Charles, George F. Gormley, George F. Gormley, P.C., Boston, MA, for Jonathan Hart, Defendant.

John H. Cunha, Jr., Cunha & Holcomb, PC, Boston, MA, for Edward Washington, Defendant.

Patricia Garin, Stern, Shapiro, Weissberg & Garin, Boston, MA, David P. Hoose, Katz, Sasson, Hoose & Turnbull, Springfield, MA, David J. Huss, Rapid City, SD, Melvin Norris, Mel Norris, Wayland, MA, Max D. Stern, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Branden Morris, Defendant.

Wayne R. Murphy, Murphy & Flaherty, Boston, MA, Walter B. Prince, Prince, Lobel Glovsky & Tye LLP, Boston, MA, for Torrance Green, Defendant.

Theodore B. Heinrich, Lori J. Holik, United States Attorney's Office, John Joseph Moakley Federal Courthouse, Boston, MA, for U.S.

Pretrial Services, U.S. Pretrial Services, Boston, for Pretrial Services, U.S. Pretrial Services, Boston, Notice.

## MEMORANDUM AND ORDER RE: MOTIONS TO STRIKE NOTICE OF INTENT TO SEEK THE DEATH PENALTY

GERTNER, District Judge.

On September 18, 2003, the government served defendants Darryl Green ("Green") and Branden Morris ("Morris") with a Notice of Intent to Seek the Death Penalty ("Notice"). The Notice indicates that, in the event that Morris and Green are convicted of murdering Terrell Gethers ("Gethers"), the government will seek to justify their death sentences on the basis of a number of aggravating factors pursuant to the Federal Death Penalty Act ("FDPA"), 18 U.S.C. § 3591 *et seq.* Among these factors are allegations of prior crimes that were not charged in the instant indictment and, indeed, have never been adjudicated in any setting. The allegations are that:

1) Morris murdered Shelby Caddell ("Caddell") prior to the offense against Gethers;[1]

---

1. The arson-murder of Caddell apparently will be the government's basis for arguing that Morris is more deserving of the death penalty than others who commit a gang-related murder (what the government alleges the shooting of Gethers to be):

2) Green attempted to murder Anthony Vaughan ("Vaughan");

3) Green also urged Edward Washington ("Washington") to attempt to murder Richard Green.[2]

In their Motions to Strike [docket entries 184, 194], defendants move, *inter alia*, that these aggravating factors be struck from the Notice, because they were never presented to the grand jury.[3]

I **GRANT** defendants' motions in part,[4] ordering that the allegations of prior unadjudicated crimes be **STRUCK** from the Notice. My ruling is based on recent Supreme Court case law on sentencing, from *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), to *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and on the unique nature of allegations of prior unadjudicated crimes. I do not suggest that unadjudicated crimes can never be weighed by a sentencing jury. Rather, I hold that they must be presented to a grand jury first.

One caveat at the outset: Defendants Green and Morris may decide to waive their right to have the unadjudicated

---

> [T]he defendant offers nothing to identify other 'similarly situated individuals' ... who have, within a period of less than two days, murdered one innocent citizen [Gethers] while firing a gun indiscriminately into a crowd of thousands and murdered another innocent citizen [Caddell] who was a paraplegic by burning down an apartment building.

Govt's Consolidated Resp. to Defs.' Pretrial Mot. Re. FDPA at 14 [docket entry # 196].

2. All references in this opinion to "Green" are to Darryl Green. Richard Green is referred to by his full name.

3. In his Amended Motion to Strike [docket entry # 194], Morris argues that his Fifth Amendment rights have been violated and that this Court should strike the entire Notice (or at least those elements of the Notice not alleged in the Indictment), not only because the Superseding Indictment fails to allege the non-statutory aggravating factors listed in the Notice (the subject of the instant decision), but also because: 1) the Superseding Indictment fails to allege the existence of any aggravating factor which the grand jury found to be sufficient to justify a sentence of death, a legally essential element for imposition of the death penalty; and 2) the government failed to inform the grand jury that the Indictment authorized the government to seek a sentence of death, or that the grand jury was required to find an aggravating factor sufficient to warrant the sentence. These additional claims are resolved briefly below. *See infra* note 27.

In his Motion to Strike [docket entry # 184], Green argues that this Court should declare the FDPA unconstitutional, strike the Notice of Special Findings from the Superseding Indictment, strike the Notice of Intent to Seek the Death Penalty, and/or strike the statutory and non-statutory factors from this case because: 1) the federal death penalty scheme is arbitrary and capricious; 2) it is racially biased; 3) it creates a substantial risk that innocent persons will be executed; 4) it has been rendered invalid by *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and *United States v. Fell*, 217 F.Supp.2d 469 (D.Vt.2002); 5) it does not allow for the use of non-statutory aggravating factors; 6) the use of certain statutory and non-statutory aggravating factors in this case is improper; 7) there has been improper delegation of non-statutory aggravating factors; 8) a weighing statute may not allow use of non-statutory aggravating factors without proportionality review; 9) the scheme lacks meaningful appellate review; and 10) the death penalty is cruel and unusual punishment.

4. Morris' Motion to Strike [docket entry # 194] is **GRANTED** in part and **DENIED** in part. *See infra* note 27. Green's Motion to Strike [docket entry # 184] is **GRANTED** in part as to remedy, but will be fully addressed on its claims in a subsequent opinion, along with Morris' Motion to Dismiss all counts of his Indictment [docket entry # 171], which is based on the same arguments.

In a prior decision, issued November 12, 2004 [docket entry # 235], I denied defendants' motions to dismiss on collateral estoppel and commerce clause grounds.

crimes charged in an indictment. First, the requirement that the government present these accusations before a grand jury may delay their trials (now scheduled to begin in early September 2005).[5] Second, defendants could decide that this Court's preliminary review of the evidence for relevance, reliability, and prejudicial effect before the penalty phase will suffice to protect their rights under the circumstances (even though such review is surely not equivalent to grand jury screening).[6] Third, the issue may become moot if the liability juries do not convict the defendants of Gethers' murder.

Defendants must notify the Court of their decision regarding waiver by June 9, 2005.

## I. *INTRODUCTION*

The FDPA is complex. At the outset, during a liability proceeding, a defendant must be found guilty beyond a reasonable doubt of a crime for which a death sentence can be imposed. *See* 18 U.S.C. § 3591(a). Here, under Count Sixteen of the Superseding Indictment [docket entry # 92], Green and Morris are charged with such a crime—the murder of Gethers in aid of racketeering pursuant to 18 U.S.C. § 1959(a)(1).

Once liability for murder has been established, the FDPA requires that a jury make three factual determinations during a second proceeding—the penalty phase of a defendant's trial.[7] *See* 3 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Federal Rules of Criminal Procedure* § 528.1 (3d ed.2004).

First, the penalty jury must find, unanimously and beyond a reasonable doubt, that the defendant had the requisite intent to commit the charged offense, as set forth in § 3591(a)(2)(A)-(D).[8] Second, the jury

---

5. This assumes that there will be no further severance orders and that the Court will proceed in the sequence specified by the March 16, 2005, scheduling order (i.e. Green and Jonathan Hart trial, followed by Morris and Washington trial) [docket entry # 315]. The parties should be on notice that, for a variety of reasons, the Court may order that the trials of the non-death-eligible defendants take place before that of the remaining defendants.

6. *See United States v. Gilbert*, 120 F.Supp.2d 147, 150 (D.Mass.2000) (quoting *Gregg v. Georgia*, 428 U.S. 153, 192, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)) (an aggravating factor much be "particularly relevant to the sentencing decision"); *id.* at 151 ("heightened reliability is crucial in capital sentencing hearings because of the uniquely grave consequences of a death verdict"); *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) ("In capital proceedings generally, [the Supreme] Court has demanded that factfinding procedures aspire to a heightened standard of reliability."); 18 U.S.C. § 3593(c) ("At the sentencing hearing, ... information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.").

7. The strictures of the FDPA call for a penalty phase proceeding that is, for all intents and purposes, a separate trial at which both sides may call witnesses and present information:

> At the sentencing hearing ... [t]he defendant may present any information relevant to a mitigating factor. . The government may present any information relevant to an aggravating factor .... Information is admissible [unless] its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury .... The government shall open the argument. The defendant shall be permitted to reply.... The burden of establishing the existence of any aggravating factor is on the government, and is not satisfied unless the existence of such a factor is established beyond a reasonable doubt.

18 U.S.C. § 3593(c).

8. To meet this intent requirement, the jury must find that the defendant:

(A) intentionally killed the victim;
(B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
(C) intentionally participated in an act, contemplating that the life of a person

must find (again, unanimously and beyond a reasonable doubt) that at least one of the statutory aggravating factors set forth in § 3592(c)(1) through (16) also exists.[9] *See* 18 U.S.C. § 3593(c). Once satisfied, these steps render the defendant *eligible* for a sentence of death.[10]

The actual imposition of death depends on the third step in the process. During the third and final step, the sentencing jury functions as no other jury. It not only hears factual allegations, as juries typically do, but it also weighs certain punishment factors, as judges typically do, to determine the defendant's sentence. Significantly, at this stage, the government may present both aggravating factors expressly listed in the statute ("statutory aggravating factors") and any other non-statutory factors that qualify as aggravators for the jury to weigh against any mitigating factors presented by the defendant.[11] *See* 18 U.S.C. § 3593(c). The jury

is then charged with determining whether the aggravating factor(s) found to exist "sufficiently outweigh [or outweighs] all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e).

The statutory aggravators listed in § 3592(c)(1) through (16) include factors related to the nature of the offense of conviction, such as "grave risk of death to additional persons" or "vulnerability of victim," as well as factors involving prior convictions of crime, such as "two felony drug offenses" or "sexual assault or child molestation." § 3592(c)(5), (11), (10), (15). The government maintains that these factors must be presented to a grand jury, while non-statutory aggravating factors need only be featured in a notice of intent.

---

would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a result of the act; or

(D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act . . . .

18 U.S.C. § 3591(a)(2)(A)-(D).

9. Under the FDPA, the aggravating factors for homicide are: (1) death during commission of another crime; (2) previous conviction of violent felony involving firearm; (3) previous conviction of offense for which a sentence of death or life imprisonment was authorized; (4) previous conviction of other serious offenses; (5) grave risk of death to additional persons; (6) heinous, cruel, or depraved manner of committing offense; (7) procurement of offense by payment; (8) pecuniary gain; (9) substantial planning and premeditation; (10) conviction for two felony drug offenses; (11) vulnerability of victim; (12) conviction

for serious federal drug offenses; (13) continuing criminal enterprise involving drug sales to minors; (14) offense committed against high public officials; (15) prior conviction of sexual assault or child molestation; (16) multiple killings or attempted killings. *See* 18 U.S.C. § 3592(c)(1)-(16).

10. Both the intent factors and the one statutory aggravating factor (knowingly creating a grave risk of death to one or more persons in addition to Gethers) alleged against Green and Morris were listed in the Superseding Indictment, and therefore screened by the grand jury.

11. 18 U.S.C. § 3592(c) provides, "the jury . . . may consider whether any other [unenumerated] aggravating factor for which notice has been given exists." In addition, 18 U.S.C. § 3593(d) states that the jury "shall return special findings identifying any aggravating factor or factors set forth in section 3592 found to exist and *any other aggravating factor for which notice has been provided under subsection (a) found to exist*" (emphasis added).

While the lack of a grand jury presentment may not raise concerns with most non-statutory aggravating factors, the instant case is different. The non-statutory aggravating factors that the government will ask the sentencing jury to weigh in determining whether to impose the death penalty include accusations of prior crimes, unrelated to the case at bar and never adjudicated in any other forum. They are uniquely prejudicial and, in our Constitution, uniquely privileged. While the Constitution grants to every citizen the right not to be "held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ...," U.S. Const. amend. V, no grand jury has ever returned an indictment linking Morris to Caddell's death, or Green to the allegations of attempted murder and aiding and abetting.

Indeed, the government's position is ironic. The statutory aggravating factors are either those already linked with the charged offense (and, therefore, generally reviewed when the grand jury reviews the indictment), or they involve convictions, obviously adjudicated in another forum. And yet, the government agrees that the statutory aggravators must be included in the indictment, while unrelated, uncharged and unadjudicated accusations of prior crimes can go directly to the sentencing jury, with only a judge as gatekeeper.

The government's rationale is that only the statutory aggravators must be presented to the grand jury because these are the factors "that render a defendant *eligible* for the death penalty." Govt's Resp. to Mot. to Strike Notice of Intent at 3–4 (emphasis added) [docket entry #182]. As described above, the sentencing jury must find at least one statutory aggravating factor before a defendant is deemed death-eligible.

Defendants disagree with the government's position.[12] They contend that the landscape for evaluating its claim has changed with the recent trilogy of cases, *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); and *Blakely v. Washington*, —— U.S. ——, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).[13] By focusing on death-eligibility, rather than on the totality of factors that bear on the actual imposition of the death penalty, the government

---

12. Indeed, defendants imply that the government cannot present aggravating factors to a grand jury at all because they are not elements of an offense defined by Congress. They argue as follows: 1) under *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that aggravating factors operate as elements of a greater offense, all of the elements of federal capital murder must be alleged by indictment; 2) however, there is currently no crime of federal capital murder; and 3) it is for Congress, not for the courts, to define the elements of a new offense. *See* Br. in Supp. of Morris's Mot. Re. the Capital Nature of this Prosecution at 77 [docket entry #172] (adopted in Green's Mem. in Support of Mot. to Strike at n. 2 [docket entry #185]). I refrain from declaring the FDPA unconstitutional on this basis. The *Blakely* Court departed from *Ring*'s language regarding offense elements,

opting for a more fluid process by which courts are to ensure that all facts legally essential to punishment—whether formally elements of an offense or not—are reviewed by grand and petit juries. *See infra* Part II.A.1.a. Moreover, defendants' traditional construct has no place in the context of the FDPA, whose unique framework invites grand jury screening of factors that go before a sentencing jury; a process with no analog in criminal law.

As indicated above, this issue will be addressed in greater detail alongside other unresolved arguments in a subsequent opinion.

13. Defendants do not invoke *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), because their motions were filed before that decision was issued.

overlooks the significance—indeed, the essence—of these cases.

Together, *Apprendi, Ring*, and *Blakely* abandoned the Court's previous focus on the procedural protections required when a defendant is exposed to punishment above the statutory maximum. They emphasized the protections that must be accorded more generally to facts, including those factors traditionally characterized as *sentencing factors*, that are essential to punishment because they increase a defendant's punishment even *within* a statutory sentencing range. Plainly, prior unadjudicated crimes that the government offers to justify the imposition of the ultimate punishment fit within this category of essential factors.

Although defendants urge the Court to treat all non-statutory aggravating factors alike and require that everything be screened,[14] my ruling is a narrow one, limited to prior unadjudicated crimes. The other non-statutory factors here (lack of remorse and victim impact), like certain of the listed statutory aggravators, are factors tied to the charged offense. They do not raise the same constitutional concerns as prior unadjudicated accusations of crime apparently unrelated to the offense and uniquely prejudicial.

Accordingly, I find that these unadjudicated prior crimes must be **STRUCK** from the Notice of Intent to Seek the Death Penalty and **EXCLUDED** from the penalty phase proceedings of Green's and Morris' capital trials.

---

**14.** Among the non-statutory aggravating factors alleged against the defendants in the Notice, two are factors relating to the offense: 1) Green is accused of lack of remorse for killing Terrell Gethers; and 2) both defendants are accused of causing injury, harm, and loss to the victim and the victim's family ("victim impact"). This opinion does not strike remorse or victim impact from the Notice.

## II. *LEGAL ANALYSIS*

### A. *Non–Statutory Aggravating Factors Should Be Charged in an Indictment under Apprendi, Ring and Blakely*

■ The FDPA expressly requires the government to submit all aggravating factors to the unanimous review of a petit jury, but it does not oblige the government to have a grand jury include those factors in an indictment.[15] *See* 18 U.S.C. § 3593(b), (e). The statute only directs that the aggravating factors appear in a notice of intent to seek the death penalty, filed by the government before trial. *See* 18 U.S.C. § 3593(a).

Recent Supreme Court decisions—notably *Apprendi, Ring*, and *Blakely*—cast constitutional doubt on the mere provision of notice as an adequate alternative to grand jury screening. In *Apprendi*, the Supreme Court held that the Sixth Amendment requires that any fact increasing a penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt.

*Blakely* went further, holding that " 'an accusation which lacks any particular fact which the law makes *essential to the punishment* is ... no accusation within the requirements of the common law, and it is no accusation in reason.' " *Blakely*, 124 S.Ct. at 2536 (emphasis added) (quoting 1 J. Bishop, *Criminal Procedure* § 87 (2d ed. 1872)). Accordingly, the Supreme Court read *Apprendi* as giving "every de-

---

**15.** As for the unanimous review requirement, the statute makes an exception when a defendant moves for a court proceeding instead of a jury hearing and the government provides its approval.

fendant ... the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment." *Id.* at 2543.

In *Ring*, the Supreme Court applied *Apprendi* to the death penalty and, in effect, to a sentencing jury context. It held that an aggravating factor under Arizona's death penalty statute must be proven to a jury beyond a reasonable doubt before it can be used by a judge to impose the death penalty. The decision's rationale readily extends beyond factors that make a defendant death-eligible, embracing all aggravating factors that may be weighed by a capital jury in its final sentencing decision.

Significantly, none of these cases distinguishes between the Sixth Amendment petit jury requirement, and the Fifth Amendment Indictment Clause, suggesting instead that they are both components of a two-tiered process of procedural protections.[16] Facts "essential" to punish-

ment must therefore be screened by a grand jury prior to their submission before a petit jury. Accordingly, an aggravating factor (even non-statutory) must be found by a grand jury before it can be used by the government to justify a death sentence.

### 1. *Blakely Applied to the FDPA*

#### a. *Non–Statutory Aggravating Factors Are "Legally Essential" to Punishment*

■  While the meaning of "legally essential" (to punishment) is clear in relation to the facts of *Blakely*, it is more ambiguous in the context of the FDPA. Under the framework in *Blakely*, much like in *Apprendi*, one aggravating factor—if found by the decision-maker—led linearly to a higher sentence and was therefore "legally essential" (i.e., if the fact-finder found $\times$ intent or $y$ drug quantity, the finding led to $z$ sentence).[17] By inference, since the

---

16. Because *Blakely* dealt with a state court sentencing scheme, the Indictment Clause was not directly implicated. The Supreme Court in *Harris v. United States*, 536 U.S. 545, 563, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), issued on the same day as *Ring*, interpreted *Apprendi* to hold that both the grand and petit juries must review all facts to which the legislature has attached the maximum punishment: "A crime was not alleged, and a criminal prosecution not complete, unless the indictment and the jury verdict included all the facts to which the legislature had attached the maximum punishment." Accordingly, circuit courts have incorporated an indictment requirement into the framework of the FDPA. *See infra* Part II.B. For example, in *United States v. Robinson*, 367 F.3d 278 (5th Cir.2004), the Fifth Circuit invoked *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); and *United States v. Cotton*, 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), to find that *Ring*'s Sixth Amendment holding "applies with equal force in the context of a Fifth Amendment Indictment Clause challenge, even though the

Supreme Court has yet to hold as much in a capital case." *Robinson*, 367 F.3d at 284.

Also, in her *Blakely* dissent, Justice O'Connor said as much. She predicted the majority's holding to mean that "facts that historically have been taken into account by sentencing judges ... must now be charged in an indictment and submitted to a jury." *Blakely*, 124 S.Ct. at 2546 (O'Connor, J., dissenting). Thus, the remainder of this opinion assumes *Apprendi* and its progeny to apply equally to the Fifth and Sixth Amendments.

17. Charged in Washington state court, Blakely pled guilty to second-degree kidnapping. Although the statutory maximum for second-degree kidnapping in Washington was ten years, Washington's Sentencing Reform Act established a "standard range" of 49 to 53 months for the facts admitted in Blakely's plea alone. Under the Act, a judge could impose a sentence above the standard range only if s/he found " 'substantial and compelling reasons justifying an exceptional sentence.' " *Blakely*, 124 S.Ct. at 2535 (quoting Wash. Rev.Code § 9.94A.120(2)). The Act

FDPA makes punishment contingent on a balancing process, all of the factors to be weighed by the decision-maker should constitute what is "legally essential" to a defendant's punishment.[18] As *Apprendi* instructed, "... the relevant inquiry is one not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?"[19] *Apprendi*, 530 U.S. at 494, 120 S.Ct. 2348. Under the unique FDPA scheme, the non-statutory aggravators at issue are among a set of factors that *together* expose Green and Morris to a greater punishment than that authorized by the jury's guilty verdict alone.

The government argues that non-statutory factors are not "essential" to the punishment of death because the jury may sentence a defendant to death once the government has satisfied the first two threshold burdens for establishing death-

listed aggravating factors, deemed illustrative rather than exhaustive, that justified such departure. *See id.* (citing Wash. Rev.Code § 9.94A.390). Having found that Blakely acted with deliberate cruelty—a statutorily enumerated ground for departing from the standard range—the judge imposed a 90–month sentence.

Reviewing Blakely's sentence, the Supreme Court applied *Apprendi*, holding that the judge's findings were "legally essential to the punishment," and that therefore the defendant was entitled to have a jury determine those facts beyond a reasonable doubt under the Sixth Amendment. Although the judge's findings only moved Blakely's punishment within the statutory range, they were nonetheless "essential" because the judge could not have sentenced Blakely beyond 53 months "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely* 124 S.Ct. at 2537 (citing *Ring*, 536 U.S. at 602, 122 S.Ct. 2428).

18. Nonetheless, the government argues that *Blakely* does not apply to the FDPA because the FDPA scheme is no different than the state scheme upheld by the Supreme Court in *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), and distinguished in *Blakely* on the theory that it did not "involve[ ] a sentence greater than what state law authorized on the basis of the verdict alone." *Blakely*, 124 S.Ct. at 2538. However, *Williams* and the case at bar are readily distinguishable. In *Williams*, under New York law, murder in the first degree was punishable by death, though the jury could recommend a life sentence, which the judge did not have to accept. Thus, a first-degree murder verdict authorized a judge to find a sentence of life or death on the basis of any finding of fact (including prior bad act), *or for no reason at all.*

As described *supra*, the FDPA does not amount to the indeterminate sentencing structure examined under *Williams*, for the possibility of a death sentence does not attach automatically to a murder verdict alone—a jury must balance particular factors to determine punishment. In addition, *Ring's* holding easily extends to the FDPA framework. *See infra* Part II.A.1.b.

Furthermore, the FDPA was designed in a context very different from the criminal code in *Williams*—at a time when discretionary, individualized sentencing had become a thing of the past with the advent of the Federal Sentencing Guidelines. Indeed, the FDPA is notably less open-ended than the scheme at issue in *Williams*.

19. Out of context, *Apprendi* 's language arguably indicates that charging one statutory aggravating factor easily passes muster, because a defendant punished according to additional uncharged factors as well is not technically exposed to a punishment greater than that reflected in the indictment. But, as explained *infra*, *Apprendi* is based on a sentencing scheme in which the finding of one additional factor linearly leads to a higher statutory maximum. In contrast, under the FDPA, while one statutory aggravating factor makes a defendant eligible for the death penalty, it is the balancing of a number of statutory, non-statutory, and mitigating factors that may "expose" a defendant to the death penalty. Thus, to say that it is enough to charge and to try one statutory aggravating factor, because this is all that is required to expose a defendant to a maximum punishment of death, is to ignore the nature of the FDPA, as well as the subsequent holding in *Blakely*.

eligibility. This argument has been adopted by numerous courts interpreting *Apprendi* prior to *Blakely*. *See infra* Parts II.A.1.b., II.B. It assumes that, since non-statutory aggravating factors alone cannot raise the statutory maximum penalty, they are merely sentencing factors, which, unlike elements of the offense, do not have to be charged in an indictment or tried before a jury.

Today, such an argument ignores the nature of the FDPA, as well as subsequent case law. Prior to *Apprendi, Ring*, and *Blakely*, and in the non-capital arena, one could say the following with confidence: Elements of an offense had to be screened by a grand jury before presentation to a petit jury. If the grand jury found probable cause to believe that the elements were present, the petit jury was obliged to decide guilt or innocence. And, if the defendant was convicted, the judge would sentence him. There were—or appeared to be—clear differences between offense facts (that went before grand and petit juries) and sentencing factors (that went before judges). *See* Judge Nancy Gertner, *Circumventing Juries, Undermining Justice: Lessons from Criminal Trials and Sentencing*, 32 Suffolk U.L.Rev. 419, 429–32 (1999).

But a death penalty case is not amenable to such a construct. The FDPA makes the death penalty jury a sentencing jury, not only conducting fact-finding, as any jury does, but also weighing aggravating and mitigating facts for the purpose of determining punishment, as judges typically do. The penalty jury's unique role muddies the distinction between offense facts, traditionally screened by grand juries, and sentencing facts, which traditionally went unscreened.

The trilogy of *Apprendi, Ring*, and *Blakely* further conflates the line between sentencing facts and offense facts. *Blake-*

*ly* explicitly rejected methodical distinctions between formal offense elements and sentencing factors, holding that all facts "essential" to punishment must be treated to the formalities of grand jury presentment and a jury trial. The Supreme Court specifically deemed it an "absurd result" that "the jury need only find whatever facts the legislature chooses to label elements of the crime; and that those it labels sentencing factors—no matter how much they may increase the punishment—may be found by the judge." *Blakely*, 124 S.Ct. at 2539. Even the government agrees that certain "sentencing facts"— here the listed statutory aggravating factor—must be screened by a grand jury.

Moreover, once a defendant is deemed death-eligible, the FDPA requires that the penalty jury impose the death penalty *only if* the aggravating factors "sufficiently outweigh" the mitigating factor or factors. 18 U.S.C. § 3593(e). This burden is not optional. Even if the defendant presents no mitigating factors, to return a sentence of death after the first two death-eligibility burdens have been met, the jury must find that the aggravating factors "alone are sufficient to justify a sentence of death." *Id.* Because we will never know exactly how each factor influences the jurors' ultimate punishment determination, logic dictates that all aggravating factors—together—be considered legally essential to the punishment. Indeed, the government's argument that non-statutory factors are not essential is disingenuous; if the government does not require additional evidence to convince the jury to vote for death, why is it invoking non-statutory factors at all?

Accordingly, any aggravating factor is "legally essential to punishment" because, while not linearly triggering a higher sentence within the statutory maximum, as Federal Sentencing Guidelines factors do, it may effectively tip the scale from life to

death in combination with the other factors at play.

### b. *Applying Blakely to the FDPA Is Consistent with the Outcome in Ring*

The Supreme Court in *Ring* held that an aggravating factor under Arizona's death penalty statute must be proven to a jury beyond a reasonable doubt. On remand, the Arizona Supreme Court interpreted *Ring* to require that not just one, but all aggravating factors urged by the government be heard by a jury. The same rationale should require that a grand jury find more than the one statutory aggravating factor necessary for death-eligibility.

Under the Arizona death penalty statute at issue in *Ring*, not unlike the FDPA, a defendant found guilty of first-degree murder could only receive a sentence of death if a judge determined the presence of at least one aggravating circumstance from a list of enumerated circumstances and found that it outweighed any mitigating circumstances. *See Ring*, 536 U.S. at 592, 122 S.Ct. 2428. This balancing scheme functions much like that of the FDPA, except that it does not involve non-statutory aggravating factors. Thus, the scheme in *Ring* proves a useful analog to the FDPA.

*Ring*'s sentencing judge determined that he was subject to two aggravating factors—commission of the offense in expec-

tation of pecuniary gain, and commission of the offense in an especially heinous, cruel or depraved manner. *See id.* at 594–595, 122 S.Ct. 2428. However, the Arizona Supreme Court found insufficient evidence to support the aggravating circumstance of depravity, so the United States Supreme Court ultimately considered a death sentence based on the existence of a single aggravating factor. *See id.* at 596, 122 S.Ct. 2428.

Though considering only one factor, the United States Supreme Court did not expressly limit its holding to require that a jury find only one aggravating factor. In concluding that, "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' . . . the Sixth Amendment requires that they be found by a jury," the Supreme Court wrote in the plural.[20] *Id.* at 609, 122 S.Ct. 2428.

Additionally, the Court opined, "[c]apital defendants, no less than non-capital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Id.* at 589, 122 S.Ct. 2428. It is far from clear that the Court interpreted the Arizona statute to condition a sentence of death on the *one* aggravating factor that makes a defendant eligible for such a sentence, when *multiple* factors

**20.** The Supreme Court effectively mandated that a jury determine whether the defendant committed the offense in expectation of pecuniary gain—the one aggravating factor at issue in *Ring*. The Court did so even though the factor was inextricably linked with the charged offense. For both logistical and constitutional reasons, I find that, unlike unadjudicated crimes, factors inextricably linked with the charged offense need not be charged by a grand jury. *See infra* Part II.A.2. My holding is not in tension with *Ring* because, faced with only one aggravating factor (neces-

sary to death-eligibility), the Court could not reach the subtle distinctions I am able to make under the facts before me. If anything, case law mandating grand jury screening of factors inextricably linked with the charged offense counsels against the use of unadjudicated crimes—lacking any procedural safeguards—without screening. Also, while this opinion largely pairs requirements for petit and grand jury screening, courts may want to start developing legitimate distinctions between factors that trigger petit jury screening and those that trigger grand jury screening.

may be balanced to determine punishment.[21]

In fact, the Arizona Supreme Court found that *Ring* did not focus single-mindedly on death-eligibility. When hearing the case on remand from the United States Supreme Court, the highest court of Arizona held that the government is required to try all statutory aggravating factors that it puts forth, in recognition of the structure of the statute. The Court wrote:

> As the State contends, once the government establishes any aggravating factor, a defendant becomes 'death eligible' in the strict sense, and establishing additional aggravating factors does not render a defendant 'more' death eligible. In our view, however, *Ring II* should not be read that narrowly. Although the Court there considered a death sentence based upon the existence of a single aggravating factor, we conclude that *Ring II* requires a jury to consider all aggravating factors urged by the State
> . . . .
> . . . [T]he legislature assigned to the same fact-finder responsibility for considering both aggravating and mitigating factors, as well as for determining whether the mitigating factors, when compared with the aggravators, call for

leniency . . . . The process involved in determining whether mitigating factors prohibit imposing the death penalty plays an important part in Arizona's capital sentencing scheme. We will not speculate about how the State's proposal would impact this essential process.

*State v. Ring*, 204 Ariz. 534, 561–62, 65 P.3d 915 (2003).[22]

The FDPA already complies with *Ring's* holding in the sense that it requires a jury to find both statutory and non-statutory aggravating factors. *See supra* Part I. Although *Ring* does not address the Fifth Amendment, other Supreme Court and circuit court opinions have paired Fifth and Sixth Amendment protections. *See supra* note 16; *infra* note 26; *infra* Part II.B. And, as *Ring* and some state courts following it have suggested, these procedural protections apply to more than one aggravating factor when the government presents multiple aggravating factors.

Logic dictates the same conclusion. In essence, Morris' alleged murder of Caddell (or Green's alleged attempted murder of Vaughan) would be part of the jury's sentencing equation, much like the statutory aggravator, grave risk of death to additional persons. Thus, it would be nonsensical

---

21. *"Ring* is clarion clear on two key scores. First[,] the capital jury must make specific findings as to aggravating circumstances. Second, those findings must be dispositive on the issue and binding on whomever does the eventual sentencing." Jeffrey Abramson, *Death–Is–Different Jurisprudence and the Role of the Capital Jury*, 2 Ohio St. J.Crim. L. 117, 149 (2004) [hereinafter "Abramson, *Death–Is–Different* "].

22. When *Ring* was decided, its holding had implications for the death sentencing procedures in eight states other than Arizona. *See* Abramson, *Death–Is–Different* at 147. Confirming this Court's interpretation of *Ring*, in response to the decision, Colorado, Idaho, and Indiana (like Arizona) "switch[ed] over to

jury determination of *all* aspects of capital fact-finding as well as jury imposition of the actual sentence." *Id.* at 148 (emphasis added); *but see Brice v. State*, 815 A.2d 314, 321–22 (Del.Supr.2003) (Supreme Court of Delaware, ruling pre-*Blakely*, interpreted Delaware's amended procedures in light of *Ring* to require a jury to find only one statutory aggravating factor—the only factor "necessary" for imposition of the death penalty—before the judge could consider imposing the death sentence); Abramson, *Death–Is–Different* at 147 (Delaware, Montana, and Nebraska all instituted similar schemes); *see also id.* at 152 (Alabama and Florida maintained advisory jury systems, which are "constitutionally suspect under *Ring* ").

to require grand jury screening of one factor, but not the other.

### 2. *Prior Unadjudicated Crimes, in Particular, Require Procedural Protections*

■ Grand jury screening is particularly indispensable where the factor at issue is a prior *unadjudicated* crime. Prior unadjudicated crimes take on special meaning under the Fifth Amendment and Supreme Court precedent. The principle that a defendant faced with the allegation of a prior *unadjudicated* crime must receive the protection of grand jury screening under the Fifth Amendment can be gleaned from Supreme Court decisions addressing prior *convictions*.

In *Almendarez–Torres v. United States*, 523 U.S. 224, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998), the Supreme Court considered a federal grand jury indictment charging the defendant with presence in the United States post-deportation—an offense carrying a statutory maximum sentence of two years. The defendant pled guilty and admitted, at his plea hearing, that he had originally been deported pursuant to three earlier felony convictions. The government then argued that, because of the defendant's recidivism, he should be sentenced under a different part of the statute, carrying a sentence of up to twenty years. The defendant objected to a sentence greater than two years in length because the indictment did not mention his earlier convictions.

The Supreme Court rejected Almendarez–Torres's argument under the theory that he had "admitted the three earlier convictions for aggravated felonies—all of which had been entered pursuant to proceedings with substantial procedural safeguards of their own ...." *Apprendi*, 530 U.S. at 488, 120 S.Ct. 2348. Employing this reasoning—the assurance of accuracy

and due process in light of prior adjudication as to the merits of criminal accusations—*Apprendi* and its progeny explicitly exempted prior convictions from the indictment and jury trial requirements. *See id.* at 476, 120 S.Ct. 2348 (" 'any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt' ") (quoting *Jones v. United States*, 526 U.S. 227, 243 n. 6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)). Similarly, since nonstatutory factors like remorse and victim impact are inextricably linked with the charged offense (and, thereby, with the procedural protections that attend the case-in-chief), arguably, Morris and Green would not be deprived of due process if they were sentenced on these bases without additional grand jury screening.

But surely it cannot be said that a prior *unadjudicated* crime, entirely separate from the charged offense, comes with the substantial procedural safeguards accompanying a prior conviction, or factors intertwined with the trial of the charged offense. Indeed, in *Shepard v. United States*, —— U.S. ——, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005), the Supreme Court found that even prior convictions, if improperly substantiated, cannot be used to increase punishment. The Court held that a sentencing court could only rely on prior convictions to enhance a defendant's sentence under the Armed Career Criminal Act if the statutorily required characteristics of those convictions were evidenced by "the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or [ ] some comparable judicial record of this information." *Id.* at 1263. The Court foreclosed a broader evidentiary inquiry that would allow a sen-

tencing court to conduct its own review of the record to ascertain the applicability of prior convictions because this would "raise[ ] the concern underlying *Jones* and *Apprendi:* the Sixth and Fifth Amendments guarantee a jury standing between a defendant and the power of the state, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence." *Id.* at 1262.

Thus, even in *Shepard,* where the disputed fact could "be described as a fact about a prior conviction[,]" the Supreme Court deemed it "too far removed from the conclusive significance of a prior judicial record, and too much like the findings subject to *Jones* and *Apprendi* to say that *Almendarez–Torres* clearly authorizes a judge to resolve the dispute." *Id.*

In this light, the Indictment Clause cannot be compromised under the assumption that the sentencing phase of the jury trial will provide defendants with the requisite procedural protection; the grand jury function can neither be ignored nor supplanted by other procedures of the government's choosing.[23] Despite taking the government's position on non-statutory aggravating factors before *Blakely, see infra* Part II.B., the Eighth Circuit called

---

**23.** Prior unadjudicated crimes also have special significance in the historical context of Fifth Amendment jurisprudence. The Supreme Court has interpreted the Fifth Amendment's Indictment Clause to require that the criminally accused have a "substantial right to be tried only on charges presented in an indictment returned by a grand jury." *Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960) (further stating that "[d]eprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error"). Again, thirty-two years after the *Stirone* decision, the Court described the Fifth Amendment grand jury right as "serv[ing] a vital function in providing for a body of citizens that acts as a check on prosecutorial power ... No doubt that is true." *United States v. Cotton,* 535 U.S. 625, 634, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002).

Centuries of history support the important role the Supreme Court placed on the grand jury in *Stirone* and its progeny, and refute the government's contention that the Indictment Clause is solely a formality to ensure notice. The "whole theory of its function is that it belongs to no branch of the institutional government, serving as a kind of buffer or referee between the Government and the people." *United States v. Williams,* 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). The initial purpose of the grand jury—in 1161 England—was inquisitional, presenting its own knowledge of wrongful activities. Robert Misner, *In Partial Praise of Boyd: The Grand Jury as Catalyst for Fourth Amendment Change,* 29 Ariz. St. L.J. 805, 828–29 (1997)

(citing 4 James F. Stephen, *Commentaries on the Laws of England,* 243–44 (21st ed.1950)). By the end of the Seventeenth Century, it was designated the task of deciding, based on material presented to it, whether a case was triable. *See id.* (citing Patrick Devlin, *The Criminal Prosecution in England* 4 (1958)). During this period, the grand jury developed the reputation as a guard of the people—"as a bulwark against oppression and despotism of the Crown." *Id.* (quoting Yale Kamisar et al., *Modern Criminal Procedure: Cases, Comments, and Questions,* 689–90 (8th ed.1994)(no citation to quotation in original)).

This reputation continued to develop in the American colonies, where as early as 1734 grand juries were refusing to carry out the misadvised will of the government—unwilling to indict individuals who criticized political leaders and, in Massachusetts, refusing to indict the leaders of the Stamp Act riots. *See id.* at 832 (citing Richard Davis Younger, *The People's Panel: The Grand Jury in the United States* 1634–1941, at 2 (1963)). Early American grand juries were not confined to criminal matters—they "acted in the nature of local assemblies: making known the wishes of the people, proposing new laws, protesting against abuses in government, performing administrative tasks, and looking after the welfare of their communities." *Id.* The grand jury's role as protectorate, reflecting the will of the people, remains largely unchanged today. Its screening function is particularly important in the case at hand—where uncharged conduct, never tested before a jury or any judicial body, could tip the scale toward death.

the Fifth Amendment's Indictment Clause "... the first of a constitutionally-mandated two-tiered check [indictment and jury trial] on prosecutorial power—a protection which reaches paramount importance in a capital case." *United States v. Allen,* 357 F.3d 745, 756 (8th Cir.2004); *see also Harris,* 536 U.S. at 564, 122 S.Ct. 2406 ("The grand and petit juries thus form a strong and two-fold barrier ... between the liberties of the people and the prerogative of the [government].") (citations omitted). The *Allen* Court also rejected the contention that the grand jury is a mere formality that rarely refuses a prosecutor's requested charge, characterizing the contention as "speculative reasoning ... [that] disregards the constitutional framework that, for felonies and capital crimes, places two separate bodies of citizens between the accused and a state-sanctioned judgment." *Allen,* 357 F.3d at 757.

A two-tiered model of procedural protections is particularly critical to achieving fairness in the FDPA context. Under a non-capital sentencing scheme, like the one at issue in *Apprendi* or *Blakely,* the Supreme Court has held that the petit jury must serve as a screen for judges on facts essential to punishment. Under the FDPA, the penalty jury essentially serves the function of both petit jury and judge, screening all facts for itself. Accordingly, without grand jury screening of unadjudicated crimes, the capital process is reduced from the two-tiered screening process suggested by *Blakely* (grand jury and petit jury screening for judge) to a process without any tiers at all (capital jury screening unadjudicated crimes for itself).

If our goal is a two-tiered system of procedural protections, then it is hard to imagine what could be more "legally essential" than ensuring that the unadjudicated prior crimes invoked against Morris and Green—allegations that may, in the end, tip the scale from life to death—be charged in their indictments.[24]

## B. *Existing Circuit Court Law on Aggravating Factors and the Indictment Clause*

Three circuits, all issuing opinions pre-*Blakely,* have disagreed with this Court's reasoning, concluding that only one statutory aggravating factor—the bare minimum necessary to qualify a particular defendant for a sentence of death under the FDPA—must be alleged in the indictment. They held that additional statutory and non-statutory factors need not be so alleged, even if the government relies on

---

**24.** Moreover, the unique role of the fact-finder under the FDPA has implications for the function of the grand jury as its screener. In the event that Morris and Green are found liable for Gethers' murder, during their sentencing proceedings, the government will present the jury with the non-statutory aggravating factors of the arson-murder of Caddell and the attempted murders of Vaughan and Richard Green. Without proof of prior conviction, this sentencing jury will have to play the role of a traditional liability jury in evaluating the veracity of the government's criminal accusations. In other words, the sentencing phases of Morris' and Green's trials would mirror the liability phases in at least one significant respect—both would involve trying

defendants for murder-related offenses under the traditional "beyond a reasonable doubt" standard.

Despite the striking similarities between liability proceedings and sentencing proceedings wherein a jury considers a defendant's culpability for a prior unadjudicated crime, the government essentially argues that the procedural protections afforded to the criminally accused in the former proceeding do not apply in the latter. This Court is not swayed by the government's argument, as it ignores the grand jury's constitutionally mandated role as buffer between the relative powerlessness of the accused and the relative might of the accuser.

them in seeking the death penalty.[25]  *See United States v. Higgs,* 353 F.3d 281 (4th Cir.2003); *United States v. Robinson,* 367 F.3d 278 (5th Cir.2004); *Allen,* 357 F.3d 745 (8th Cir.2004), *rev'd en banc,* 406 F.3d 940 (8th Cir.2005).

In *Robinson,* a decision representative of all three circuit opinions, the defendant challenged his conviction and death sentence under the Fifth Amendment, arguing that the indictment failed to charge the statutory aggravating factors that rendered him eligible for the death penalty. *See* 367 F.3d at 281.  The *Robinson* Court construed *Ring's* holding as hinging on death-eligibility: "where an aggravating factor renders a defendant *eligible* for death, it is 'the functional equivalent of an element of a greater offense' and therefore must be proven to a jury beyond a reasonable doubt."  *Id.* at 284 (emphasis added).  Accordingly, the court held that "the government is [only] required to charge, by indictment, the statutory aggravating factors it intends to prove to render a defendant *eligible* for the death penalty, and its failure to do so . . . is constitutional error."  *Id.* (emphasis added); *see also Allen,* 357 F.3d at 748; *Higgs,* 353 F.3d at 298.

Under the circuit courts' holdings, prior unadjudicated crimes—non-statutory aggravators under the FDPA—would be presented to the sentencing jury without the protective screening of a grand jury indictment because they are not a prerequisite to death-eligibility and therefore do not elevate the available statutory maximum sentence from life imprisonment to death.  As discussed *supra,* this outcome is irreconcilable with the Fifth Amendment, *Blakely,* and even *Ring.*

In fact, the Fifth Circuit in *Robinson* at once downplayed *and* affirmed the role of the grand jury.  Despite its holding's inconsistency with the principles of the Fifth Amendment, the court invoked Supreme Court precedent to assert the two essential functions of the indictment process: 1) notice to the defendant of the charge so that s/he may prepare a defense; and 2) "interpos[ing] the public into the charging decision such that a defendant is not subject to jeopardy for a crime alleged only by the prosecution."  *Robinson,* 367 F.3d at 287.

While, under the FDPA, the government can fulfill its notice obligation apart from the indictment, the indictment itself is the only means by which the public serves as a pre-trial buffer between the prosecutor and the defendant.[26]  Since such protection

25.  Focusing on what triggers death eligibility under the FDPA, all three circuits drew two conclusions.  First, "only the statutory [as opposed to non-statutory] aggravating factors . . . trigger the Fifth Amendment's Indictment Clause, because they are the only factors that render the defendant eligible for death."  *Robinson,* 367 F.3d at 289 n. 16; *see also Higgs,* 353 F.3d at 298.  That is, "[b]ecause nonstatutory aggravating factors do not increase the available punishment to which a defendant might be subjected, they are not required to be alleged in the indictment."  *Higgs,* 353 F.3d at 299.  Second, it is enough for the grand jury to charge only one statutory aggravating factor because only one factor is required under the Act to render a defendant death-eligible.  *Robinson,* 367 F.3d at

289 n. 18; *see also Higgs,* 353 F.3d at 299; *Allen,* 357 F.3d at 749.

26.  As described above, *see supra* note 16, Justice O'Connor predicted the *Blakely* holding's applicability to the Indictment Clause in her dissent.  *See Blakely,* 124 S.Ct. at 2546 (O'Connor, J., dissenting).  While *Blakely* did not address the purposes of the indictment process directly, it implied a concern for providing defendants with notice, and ensuring "the people's ultimate control . . . in the judiciary."  *Id.* at 2539.  However, O'Connor presented evidence that notice might not have been the majority's primary driving force.  The defendant had already been informed about a potential statutory maximum sentence of 10 years through the charging docu-

cannot be provided once a trial has already begun, *Robinson* recognized that "meaningful enforcement of this right always will depend, in the main, on the vigilance of the trial court and on its willingness to require that a defective indictment be amended before trial." *Id.* at 287. Thus, the Fifth Circuit's acknowledgment of the grand jury's important function is difficult to reconcile with its conclusion that the trial court's vigilance need only apply to the one statutory aggravator qualifying a defendant for death under the FDPA, while potentially more weighty aggravators slip by the grand jury and nonetheless appear before a sentencing jury.

Notably, each of the three circuit court decisions were issued before the Supreme Court decided *Blakely*. The *Higgs* Court, for example, argued that non-statutory aggravators relied upon by the government at trial need not be included in the indictment because "the purpose of non-statutory aggravators is to aid the factfinder in selecting the appropriate sentence from the available options." *Higgs*, 353 F.3d at 298. As discussed *supra*, *Blakely* explicitly rejected such formalistic distinctions be-tween elements of a crime and sentencing factors. An emphasis on effect over form reinforces the idea that death-eligibility should not be the sole factor in determining what is to go before the grand jury under the FDPA. Where defendants may be subject to death on the basis of prior unadjudicated crimes, surely such formalism finds even less room.

## III. CONCLUSION

For the reasons discussed above, I hereby **ORDER** that prior unadjudicated crimes be **STRUCK** from the government's Notice of Intent to Seek the Death Penalty, unless the defendants waive grand jury presentment.[27]

**SO ORDERED.**

---

ment, his plea agreement, and during his plea hearing. Furthermore, "the guidelines served due process by providing notice to petitioner of the consequences of his acts." *Id.* at 2547. If O'Connor was right, then an interest beyond notice motivated the Supreme Court in *Blakely* to effectively expand the role of the indictment process. It is thereby appropriate to interpret the Supreme Court's holding in a way that provides defendants faced with conviction on the basis of unadjudicated prior crimes with the requisite procedural protections.

27. As stated above, *see supra* note 3, Morris argues that the Indictment is inadequate because the grand jury did not make a finding that at least one aggravating factor is sufficient to justify a sentence of death and the government failed to inform the grand jury that the Indictment authorized the government to seek a sentence of death, or that the grand jury was required to find an aggravating factor sufficient to warrant the sentence. I conclude that it is not the grand jury's function to determine whether a certain punishment should actually be applied, and therefore that there was no reason for the government to inform the grand jury about its intention to seek the death penalty. To truly assess the sufficiency of an aggravating factor under the FDPA, the grand jury would have to determine whether it "sufficiently outweigh(s) all the mitigating factor or factors found to exist to justify a sentence of death, or in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e). Since the grand jury is not privy to the mitigating factors (or lack thereof) that the petit jury has to weigh against any aggravating factors in determining whether a death sentence is justified, it cannot possibly be expected to make a sufficiency determination.