# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

————————————

No. 201600327

————————————

## UNITED STATES OF AMERICA
Appellee

v.

## GARRY W. MITCHELL
Aviation Electronics Technician Second Class (E-5),
United States Navy
Appellant

————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Charles N. Purnell, JAGC, USN.
Convening Authority: Commander, Navy Region Mid-Atlantic,
Norfolk, VA.
Staff Judge Advocate's Recommendation: Commander Andrew R.
House, JAGC, USN. Addendum: Commander M.B. Pohanka, JAGC,
USN.
For Appellant: Lieutenant Commander William L. Geraty, JAGC,
USN.
For Appellee: Lieutenant Commander Justin C. Henderson, JAGC,
USN; Captain Brian L. Farrell, USMC.

————————————

Decided 27 March 2018

————————————

Before HUTCHISON, PRICE, and FULTON, *Appellate Military Judges*

————————————

## PUBLISHED OPINION OF THE COURT

————————————

FULTON, Judge:

A military judge, sitting as a general court-martial, acquitted the appellant of three specifications of attempted premeditated murder but convicted him, contrary to his pleas, of two specifications of the lesser

included offense of aggravated assault with a means likely to produce death or grievous bodily harm in violation of Article 128, Uniform Code of Military Justice (UCMJ).[1] The military judge also convicted the appellant of one specification of child endangerment in violation of Article 134, UCMJ.[2] The military judge conditionally dismissed the child endangerment specification. The convening authority approved the adjudged sentence of seven years' confinement, forfeiture of all pay and allowances, reduction to paygrade E-1, and a dishonorable discharge.

The appellant assigns the following errors:

(1) assault on a child under 16 with means likely to cause death or grievous bodily harm is not a lesser included offense of attempted murder, and the appellant was therefore not on notice that he could be convicted of this offense;

(2) the convictions are factually insufficient;

(3) the military judge erred by finding that the symptoms experienced by the infant victim in this case, namely somnolence, lethargy, emesis, and pinpoint pupils constitute serious health issues;

(4) the government violated the appellant's right to a speedy trial under Rule for Courts-Martial (R.C.M.) 707;[3]

(5) the military judge erred when he failed to follow the *Daubert* framework[4] and allowed a toxicologist to testify about a novel theory of drug metabolism in infants; and,

(6) his counsel were ineffective because, after findings, they failed to introduce medical records that tended to contradict one of the military judge's special findings.

The last four errors are raised personally by the appellant.[5]

In addition to these assignments of error (AOEs), the appellant petitions for a new trial based on alleged fraud on the court-martial and newly discovered evidence.

---

[1] 10 U.S.C. § 928 (2006).

[2] 10 U.S.C. § 934 (2006).

[3] RULE FOR COURTS-MARTIAL (R.C.M.) 707, MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2012 ed.)

[4] *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

[5] *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

We have reviewed the third and sixth AOEs and find that they are without merit.[6] We address the remaining AOEs and the petition for a new trial below. Having carefully considered the record of trial and the parties' submissions, we conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights.[7] We also find that there are no grounds on which to order a new trial.

## I. BACKGROUND

The court-martial convicted the appellant of poisoning his infant son, RM, with hydrocodone, an opiate pain medication. The government's theory at trial was that the appellant put hydrocodone into RM's bottle on three occasions. The defense conceded that someone poisoned RM with hydrocodone, but argued that the evidence did not exclude the possibility that the appellant's wife, or someone else, poisoned RM without the appellant's involvement.

After trial on the merits, the military judge acquitted the appellant of attempted murder but convicted him of two specifications of the lesser included offense of assault with a means likely to cause death or grievous bodily harm. These convictions represent the military judge's finding that on two occasions, 7 July and 22 July 2011, the appellant poisoned RM with hydrocodone.

We will address the remaining relevant facts in the discussion.

## II. DISCUSSION

### A. Notice of the lesser included offense

Before findings, the military judge and the parties discussed lesser included offenses. The parties agreed that aggravated assault—particularly assault with means likely to cause grievous bodily harm under Article 128(b)(1), UCMJ—was a lesser included offense of attempted murder. Neither the parties nor the military judge expressly addressed the possibility that the lesser charge encompassed RM's status as a child under 16.

The military judge acquitted the appellant of attempted premeditated murder but convicted him, through exceptions and substitutions, of two specifications of assault *on a child under 16* with means likely to produce death or grievous bodily harm. The appellant did not object to the findings.

At the beginning of the sentencing case, the military judge asked trial counsel about the maximum sentence for the offenses of which the accused

---

[6] *See United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).

[7] Arts. 59(a) and 66(c), UCMJ.

stood convicted. Both trial and defense counsel agreed that the maximum confinement for each aggravated assault specification was five years—a maximum that would seem to reflect an understanding that the appellant was being sentenced for an aggravated assault on a child under the age of 16 years.[8]

After sentencing, the military judge raised the issue of whether aggravated assault on a child under the age of 16 was a lesser included offense of attempted murder. The military judge noted that he had performed a strict elements analysis on the lesser included offenses and that "one of the elements of aggravated assault is . . . that the child is under 16, which is not an element of premeditated murder."[9] He went on to explain that in spite of this element, he found that the conviction was proper for two reasons: first, because he didn't "view that—what's listed in the Bench Book as an element, and referred to as an element, to actually be an element . . . since the government is not required to prove that the accused had knowledge of that[;]" and, second, because "the government was required to prove, with respect to premeditated murder, that there was a named victim . . . the court considers it axiomatic that a child, who is a person for the purposes of the charge of premeditated murder, is still . . . a child[.]"[10]

The military judge then invited the parties to give their views on the matter. The trial defense counsel (TDC) agreed that the victim's age is not a statutory element:

> Even though the MCM language that the President has put in separates our assault on a child under 16, it's not part of the statute. . . . And the age of the victim in the case might be a factor that one considers in aggravation, but it's technically not an offense of assault on a child under 16 with a means likely.
>
> That being said, the maximum punishment for assault with a means likely is 5 years, that's what all the parties understood. I believe that's what he was sentenced for, 5 years per offense, being 10 years maximum.[11]

The TDC then added, incongruously, "whether the victim was a child under 16, I think, would not be relevant to that maximum punishment . . . ."[12]

---

[8] *See* MCM, Part IV, ¶ 54e(8)(b).

[9] Record at 986.

[10] *Id.*

[11] *Id.* at 988.

[12] *Id.*

On appeal the appellant complains that the Article 128 offenses of which he was convicted were not lesser included offenses of the charged offenses. Applying the strict elements test prescribed by the Court of Appeals for the Armed Forces (CAAF) in *United States v. Jones*,[13] the appellant argues that aggravated assault on a child under 16 is not a lesser included offense because it contains an element—that the victim is a child under 16—not included in the greater offense, attempted murder. And since the offense for which he was convicted was not a lesser included offense, the appellant argues that he was not on notice that he had to defend against it at trial.

The government argues that the appellant waived the issue by failing to object to the language "a child under the age of 16 years" in the military judge's findings, and by agreeing to the inclusion of that language after the military judge invited objection. Absent waiver, the government argues that the military judge did not plainly err by convicting the appellant of aggravated assault because the purported element requiring that the victim be a child under 16 is not a statutory element at all; rather it is a presidentially created sentence escalator that, when found by a court-martial, increases the authorized punishment. Finally, the government argues that because the appellant was also charged with child endangerment for the same conduct, any notice defects did not prejudice the appellant.

In reply to the government's argument, the appellant refines his assignment of error. He acknowledges that the sentence-escalating circumstance that the victim is under 16 is not a statutory element as envisioned by *Jones*. But he argues that *Jones*'s requirement that each part of a lesser offense be "transparent, discernible *ex ante*, and extant"[14] in the greater offense applies with equal force to both statutory elements and sentence escalators. The specifications alleging attempted premeditated murder of RM did not address the victim's age and therefore, according to the appellant, failed to notify the appellant that he had to defend against this offense.

*1. Waiver*

We will first address the government's contention that the appellant waived the error. Waiver is the "intentional relinquishment or abandonment of a known right[.]"[15] We look to the particular facts and circumstances of a

---

[13] 68 M.J. 465, 470 (C.A.A.F. 2010).

[14] *Id.* at 468.

[15] *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

case to determine whether a party has intentionally relinquished a known right.[16]

The TDC agreed both before findings and after sentencing that aggravated assault is a lesser included offense of attempted murder. And the TDC did not object to the findings that the appellant committed aggravated assault on a child less than 16 years of age. He also agreed on two occasions that the maximum authorized confinement associated with each specification was five years—a maximum that could only apply if the TDC understood that the appellant was being sentenced using the enhanced punishments associated with a victim under 16 years of age.

On the other hand, the record contains an indication that the TDC's agreement to the potentially higher sentence did not represent an intentional relinquishment of a known right. While acknowledging that the victim's age might be a consideration that the military judge found aggravating, the TDC opined that the age of the victim was not relevant to the maximum punishment. This was incorrect. Had the military judge not taken the victim's age as a circumstance that increased the maximum authorized punishment, the maximum possible confinement for each specification would have been only three years.[17] The TDC's apparent misunderstanding about how the government and the military judge arrived at a maximum sentence tends to undercut the government's contention that the appellant intentionally relinquished a known right. Rather, the record may simply reflect that the TDC erroneously believed that the maximum sentence for aggravated assault with means likely to produce death or grievous bodily harm was five years no matter the victim's age. We cannot conclude on this record that the appellant waived the issue.

*2. Aggravated assault as a lesser included offense of attempted premeditated murder*

Even though we find that the issue was not waived, the TDC did not make a timely objection at trial, and therefore forfeited the issue.[18] We will therefore review the issue for plain error.[19] In order to prevail under a plain-error analysis, the appellant must demonstrate that: (1) there was an error;

---

[16] *United States v. Elespuru*, 73 M.J. 326, 328 (C.A.A.F. 2014).

[17] MCM, Part IV, ¶ 54e(8)(c).

[18] *See United States v. Gladue*, 67 M.J. 311, 313 (C.A.A.F. 2009)

[19] *See United States v. Harcrow*, 66 M.J. 154, 156-158 (C.A.A.F. 2008)

(2) it was plain or obvious; and (3) the error materially prejudiced a substantial right.[20]

As an initial matter, we agree with the military judge that aggravated assault is a lesser included offense of attempted premeditated murder.

Article 79, UCMJ, provides that "[a]n accused may be found guilty of an offense necessarily included in the offense charged[.]"[21] This provides the statutory authority for a military judge to convict on, and an appellate court to affirm, a lesser included offense.[22]

To determine whether one offense is a lesser included offense of another, we examine the elements of each offense.[23] The CAAF has explained this test as follows: "If all of the elements of offense X are also elements of offense Y, then X is [a lesser included offense] of Y. Offense Y is called the greater offense because it contains all of the elements of offense X along with one or more additional elements."[24] We look to the normal rules of statutory construction in conducting this analysis; the two offenses need not employ identical statutory language.[25]

We agree with the appellant on the elements of the greater offense, attempted premeditated murder. The elements of attempt are:

(1) that the accused did a certain overt act;

(2) that the act was done with the specific intent to commit a certain offense under the code;

(3) that the act amounted to more than mere preparation; and,

(4) that the act apparently tended to effect the commission of the intended offense.[26]

The elements of the target offense, premeditated murder, are as follows:

(1) that a certain named or described person is dead;

---

[20] *See United States v. Tyndale*, 56 M.J. 209, 217 (C.A.A.F. 2001)

[21] 10 U.S.C. § 879 (2012).

[22] *See United States v. Girouard*, 70 M.J. 5, 9 (C.A.A.F. 2011).

[23] *See Jones*, 68 M.J. at 470.

[24] *United States v. Tunstall*, 72 M.J. 191, 194 (C.A.A.F. 2013) (quoting *Jones*, 68 M.J. at 470).

[25] *See United States v. Riggins*, 75 M.J. 78, 83 (C.A.A.F. 2016).

[26] MCM, Part IV, ¶4b.

(2) that the death resulted from the act or omission of the accused;

(3) that the killing was unlawful; and,

(4) that, at the time of the killing, the accused had a premeditated design to kill.[27]

The elements of the lesser offense aggravated assault are:

(1) that the accused attempted to do, offered to do, or did bodily harm to a certain person;

(2) that the accused did so with a certain weapon, means, or force;

(3) that the attempt, offer, or bodily harm was done with unlawful force or violence; and

(4) that the weapon, means, or force was used in a manner likely to produce grievous bodily harm.[28]

We find that the elements of aggravated assault are included in the elements of the greater offense. Its first and second elements, that the accused did bodily harm with a certain means to a certain person, are fairly included in the second element of premeditated murder; that a death resulted from the act or omission of the accused. The third element, that the bodily harm was done with unlawful force or violence, is included in the third element of premeditated murder; that the killing was unlawful. And the fourth element, that the means of the assault be used in a manner likely to produce grievous bodily harm, is included in the second element of premeditated murder; that a death resulted from the act or omission of the accused. It is also included in the fourth element of attempt; that the act apparently tended to effect the commission of the intended offense. We find, therefore, that aggravated assault is a lesser included offense of attempted premeditated murder.

In his initial brief, the appellant argues that in this case the lesser offense includes a fifth element—that the victim was a child under the age of 16 years. If the appellant is right, then the lesser offense contains an element not included in the greater offense. And indeed, the Manual for Courts-Martial lists as a potential element of aggravated assault "[t]hat the person was a child under the age of 16 years."[29]

---

[27] MCM, Part IV, ¶43b(1).

[28] MCM, Part IV, ¶54b(4)(a)(i)-(iv).

[29] MCM, Part IV, ¶54b(1)(a)(vi).

Even though this potential element is listed in Part IV of the MCM, we do not consider it in conducting the strict elements test required by *Jones*. In determining the elements of an offense for purposes of a *Jones* analysis, courts have often deferred to the President's listing of elements in Part IV of the Manual.[30] This deference is often appropriate, as the President's interpretations of offenses are persuasive.[31] Most elements described in the Manual are rooted in the relevant statutory language. But Congress, not the President, is ultimately responsible for establishing the elements of an offense under the UCMJ.[32] This responsibility has not been—and could not be—delegated to the President.[33] We are, therefore, not bound by the President's description of an offense's elements.[34] And when a sentence-enhancing element found in Part IV of the Manual is not rooted in the language of the punitive article passed by Congress, we will not consider it in conducting an elements test under *Jones*. These "elements" are more properly viewed as sentence escalators that the President has determined are worthy of more severe authorized punishments.[35] They are not statutory elements of UCMJ offenses.

In this case, the four elements of aggravated assault we evaluated in our *Jones* analysis—taken from Part IV of the Manual—are rooted in the statutory language of Article 128, UCMJ. The appellant's proposed fifth element—that the victim was under 16—has no basis in the underlying statute. Article 128, UCMJ makes no reference to the age of the victim. Therefore the matter of the victim's age is not a statutory element. Rather, it is a sentence escalator that the President has determined should increase the maximum authorized punishment in aggravated assault cases.

*3. Notice*

Even though we find that sentence escalators created by the President in Part IV but not rooted in statute are not elements for purposes of a *Jones* elements test, this holding does not completely answer the appellant's assigned error. In his reply brief, the appellant alleges that the real problem

---

[30] *See e.g. Tunstall*, 72 M.J. at 194; *Riggins*, 75 M.J. at 83.

[31] *See Jones*, 68 M.J. at 471-72.

[32] *See id.* at 471.

[33] *Id.*

[34] *United States v. Davis*, 47 M.J. 484, 486 (C.A.A.F. 1998) (citing *United States v. Mance*, 26 M.J. 244, 252 (C.M.A. 1988)).

[35] 10 U.S.C. § 856(a) (2006) ("The punishment which a court-martial may direct for an offense may not exceed such limits as the President may prescribe for that offense.").

with his conviction is notice. Did the military judge plainly err by finding that the specifications alleging that he attempted to murder RM sufficiently notified him that he would have to defend against a lesser included offense, the potential penalty for which was enhanced by virtue of the victim's age?

Generally, sentence escalators that increase the maximum authorized punishment must be alleged in the specification in order to permit the increased punishment. This requirement is found both in the Rules for Courts-Martial and, arguably, in Supreme Court case law.[36] The appellant argues that this requirement should be extended to sentence escalators pertaining to lesser included offenses—offenses that do not even appear on the charge sheet in their own right. Thus, in the context of this case, the specifications alleging attempted murder would have had to allege that RM was a child under the age of 16 years in order for the government to avail itself of the increased authorized punishment for assaulting a child under 16.

The appellant compares sentence escalators in lesser included offenses to other matters not amounting to elements that must be pleaded. The appellant's strongest argument for this position arises from a published case we decided three years ago, *United States v. Bass*.[37] The issue in *Bass* is closely related to the issue in this case and is worth discussing in depth. In *Bass,* the appellant was charged with two specifications of forcibly sodomizing another Sailor onboard a Navy ship. The military judge instructed the members that they could convict Petty Officer Bass of the lesser included offense of non-forcible sodomy, but only if they found beyond a reasonable doubt the existence of a *Marcum* factor—a factor that makes otherwise-constitutionally-protected sexual conduct a crime.[38]

Petty Officer Bass was acquitted of forcible sodomy, but convicted of two specifications of non-forcible sodomy under the same article. We conducted an elements test of the two offenses and determined that non-forcible sodomy was a lesser included offense of forcible sodomy. But Bass argued that the military judge committed plain error by instructing the members on *Marcum* factors that had not been alleged in the greater specification of forcible sodomy.

---

[36] R.C.M. 307(c)(3); *See also United States v. Akbar*, 74 M.J. 364, 404, (C.A.A.F. 2015) ("The Supreme Court has determined that the Fifth Amendment's due process clause and the Sixth Amendment's notice and jury trial guarantees require any fact 'that increases the maximum penalty for a crime [to be] charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.'") (quoting *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) (alteration in original)).

[37] 74 M.J. 806 (N-M. Ct. Crim. App. 2015).

[38] *See United States v. Marcum*, 60 M.J. 198 (C.A.A.F. 2004)

The government argued that because the specification alleged that the offense happened onboard a ship, Bass was on notice that the alleged acts implicated a "unique military interest"—one of the *Marcum* factors.

We found plain error. We acknowledged that non-forcible sodomy requires that the government prove the existence of a *Marcum* factor. And because the presence of a *Marcum* factor is a fact necessary to constitute the crime of sodomy, we found it to be the functional equivalent of an element. It must be alleged and proved beyond a reasonable doubt. We also found that alleging that the situs of the offense was a Navy ship was constitutionally insufficient notice that Bass would have to defend against an allegation that his conduct was punishable for any reason other than its having been nonconsensual.

In this case, the appellant argues that the sentence escalator of which he was convicted is like the missing *Marcum* factors in *Bass*. He argues, and we agree, that the sentence escalator that the victim was a child under 16 years of age is the functional equivalent of an element in this case. The victim's age is a fact that, if proved, increases the authorized maximum punishment. Due process requires, therefore, that the fact be pleaded and proved beyond a reasonable doubt.[39] He further argues that just as a specification alleging that Petty Officer Bass's offense took place on a ship failed to notify Bass that he would have to defend against the *Marcum* factors, the specification naming the appellant's infant son as the victim of an attempted murder failed to notify him that he could be convicted of aggravated assault against a child under 16 years of age.

The military judge found that specifications naming the appellant's infant son as the victim of attempted murder reasonably notified the appellant that he might be convicted of aggravated assault on a child under 16 years of age. Unlike in *Bass*, the military judge found that the appellant had actual notice of the functional element in question; the sentence-escalating age of the victim. We find that this conclusion is not plainly or obviously erroneous. While requiring that sentence escalators of lesser included offenses be specifically pleaded might represent a logical extension of existing law, we can find no current authority that requires this practice. We agree with the

---

[39] *Cf. Apprendi v. New Jersey*, 530 U.S. 466, 500 (2000) (Thomas, J., concurring ("In order for an accusation of a crime to be . . . proper under the codification of the common-law rights in the Fifth and Sixth Amendments, it must allege all elements of that crime; likewise, in order for a jury trial of a crime to be proper, all elements of the crime must be proved to the jury (and . . . proved beyond a reasonable doubt)" (citations omitted)).

government that the plain error doctrine does not reach the appellant's request to extend the precedent established by *Bass*.[40]

Even if we concluded that the military judge erred, and that the error was plain or obvious, we would not grant relief. Both civilian and military courts have termed the failure to specifically charge functional elements such as sentence escalators "*Apprendi* error."[41] *Apprendi* errors are not structural, and can be tested for prejudice. Failing to plead a functional element implicates an accused's substantial right to notice under the Fifth and Sixth Amendments.[42] To determine whether lack of notice prejudiced an appellant, "we look to the record to determine whether notice of the missing element is somewhere extant in the trial record, or whether the element is 'essentially uncontroverted.'"[43]

We find that both considerations favor the government. First, the missing element is found not only elsewhere in the record, but on the charge sheet. The appellant was charged with and convicted of child endangerment, in violation of Article 134, UCMJ,[44] with RM named as the victim in the specification. One of the elements of child endangerment is that the victim is a child under the age of 16 years.[45] In support of this element, the specification alleges that RM was a child under the age of 16 years. Second, RM's age was not—and could not have been—seriously contested by the appellant at trial. The evidence that RM was an infant at the time of the offenses was overwhelming and uncontroverted. We find, therefore, that any error in these specifications did not materially prejudice the appellant's substantial right to constitutionally sufficient notice. This assignment of error is without merit.

---

[40] *See United States v. Nieto*, 66 M.J. 146, 151 (C.A.A.F. 2008) (Stucky, J. concurring).

[41] *Akbar*, 74 M.J. at 404-05; *United States v. Robinson*, 367 F.3d 278, 285 (5th Cir. 2004).

[42] *United States v. Humphries*, 71 M.J. 209, 215 (C.A.A.F. 2012); *see also United States v. Cotton*, 535 U.S. 625, 633 (2002)).

[43] *Humphries,* 71 M.J. at 215-16 (quoting *Cotton*, 535 U.S. at 633) (additional citation omitted).

[44] 10 U.S.C. § 934 (2006).

[45] MCM, Part IV, ¶ 68a.b(2).

## B. Legal and factual sufficiency

We review issues of legal and factual sufficiency de novo.[46] The test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable fact finder could have found all the essential elements beyond a reasonable doubt.[47] In weighing questions of legal sufficiency, we draw every reasonable inference from the evidence in the record in favor of the prosecution.[48]

The test for factual sufficiency is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of the accused's guilt beyond a reasonable doubt.[49]

We first consider whether the facts of this case satisfy the elements of aggravated assault. Again, those elements are:

> (1) that the accused did bodily harm to a certain person;
>
> (2) that the accused did so with a certain means, in this case by poisoning RM with an opiate;
>
> (3) that the bodily harm was done with unlawful force or violence; and,
>
> (4) that the means was used in a manner likely to produce grievous bodily harm.[50]

We find that the government proved these elements beyond a reasonable doubt in both specifications.

RM was born prematurely and stayed for two weeks in the hospital's neonatal intensive care unit and was then released to the appellant and his wife. RM was healthy when he was discharged. A doctor prescribed RM's mother a ten-day supply of Percocet, a pain medication containing oxycodone.

Three days after his release, RM's parents took RM to the emergency room at Naval Medical Center Portsmouth because he had "red streaks in his vomit."[51] The medical staff evaluated RM and monitored him for a time in the

---

[46] Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)).

[47] *United States v. Humpherys*, 57 M.J. 83, 94 (C.A.A.F. 2002).

[48] *See United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001).

[49] *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987).

[50] MCM, Part IV, ¶54b(1)(a)(i)-(iv).

[51] Record at 544.

emergency room. They noted no vomiting, no difficulty breathing, or anything else that caused concern.

Over the next two weeks, the appellant and his wife took RM to the emergency room several times for various issues, with medical personnel noting RM appeared in good health and medically stable. RM's medical record indicates that he was breastfeeding and does not indicate that RM was suffering from any respiratory distress.

On 16 June 2011, RM's parents took him to the emergency room for respiratory distress.[52] RM was blue, limp, and unable to breathe on his own. Doctors were so concerned during their resuscitation efforts that they called the chaplain. At last, hospital staff were able to stabilize RM and admit him to the pediatric intensive care unit. Despite conducting several tests and examinations, doctors were unable to explain RM's sudden respiratory failure. The hospital discharged RM a week after he arrived, without RM having had any further respiratory distress.[53]

Four days later, RM was again admitted to the hospital for "slow response and slow breathing."[54] Medical personnel initially found RM to be lethargic and sleepy but breathing normally. But he suddenly became apneic and was once again transferred to the pediatric intensive care unit, where he remained for ten days.[55] Then he was transferred to the pediatric ward.[56] Immediately after the transfer, RM's health worsened.

In the evening and early morning hours of 7-8 July 2011, the appellant fed RM from a bottle in RM's hospital room. At around 0300, RM's respiratory rate dropped and he was observed as having "pinpoint pupils." His breathing was "shallow and also slow and he was breathing something like 14 to 18 times per minute; what's normal for an infant is usually 20 to 30 times per minute."[57] The hospital again transferred RM to intensive care. Again, hospital staff conducted a series of tests and examinations to try to determine why RM was suddenly becoming ill. But this time they tested RM's urine for opiates. RM's urine tested positive for opiates—specifically hydrocodone and hydromorphone.

---

[52] *Id.* at 582.

[53] *Id.* at 593, 595.

[54] *Id.* at 597.

[55] *Id.* at 600.

[56] *Id.* at 606.

[57] *Id.* at 611-12.

RM returned to the regular pediatric ward and had no more medical issues for 11 days. On 22 July—the same day the he refilled his own prescription for hydrocodone—the appellant prepared bottles for RM and fed RM part of one. After the appellant left the hospital room, a nurse tried to feed the rest of the bottle to RM, but he had become too sleepy. When the nurse tried to get RM to finish the bottle, he needed stimulation to feed, stopped responding to what was going on around him, and his eyes stopped following objects. His pupils became small. This cluster of symptoms prompted another urine screen, and this screen too tested positive for hydrocodone and hydromorphone. RM's medical records indicate no healthcare provider administered or prescribed any medication that would have resulted in a positive test for opiates.[58] Expert testimony also showed that the symptoms RM displayed were "significant medical events," carrying "serious consequences" to his health—including putting his life at risk.[59] After Naval Criminal Investigative Service (NCIS) and Child Protective Services prohibited the appellant and his wife from direct visitation and care of RM, he exhibited no more symptoms of opiate exposure.

The sole matter in dispute at the appellant's trial was the identity of the person responsible for poisoning RM. The government presented compelling evidence that the appellant was at least in part responsible. The appellant had a current prescription for hydrocodone,[60] for which RM's urine tested positive.[61] And RM only became ill on occasions when the appellant had had contact with RM and shared in his care.

The appellant made statements to an NCIS Special Agent, blaming hospital staff for RM's poisoning. He argued that his breastfeeding wife had been prescribed pain medication and claimed that his wife's prescription was responsible for RM's respiratory failure. This explanation was contradicted by his wife's prescription history and was medically implausible. The military judge—correctly in our view—assessed these protestations to be "contrived and to reflect consciousness of guilt."[62]

An NCIS digital forensic examiner testified regarding a search conducted on the appellant's electronic media, which included computers, hard drives, tablets, phones, and thumb drives. During his search, the examiner identified internet browser searches conducted on the appellant's home computer,

---

[58] *Id.* at 423.

[59] *Id.* at 586, 655.

[60] Prosecution Exhibit 14 at 1; Prosecution Exhibit 15 at 1.

[61] Prosecution Exhibit 13 at 1.

[62] Appellate Exhibit LVI at 5.

including three separate searches for "baby coffins,"[63] searches for "Benadryl overdose,"[64] and "can [they] . . . test for codine [sic] overdose?"[65] The searches for "baby coffin" began in early June, shortly before RM's first episode of respiratory failure. At least one search for "baby coffins" occurred while the appellant's Facebook account was active on the same computer.

Other web searches also tended to show the appellant's guilt. The forensic search of the appellant's computer revealed searches for "Military Doctors messes [sic] up and calls CPS to cover for their mistake?" and "Can they tell the difference from Hydrocodone and Oxycodone?"[66] Although the computer in question was a shared family computer, and it is impossible to rule out the appellant's wife as the party responsible for the searches in question, the searches were made close in time to other searches related to telescopes and electronics—two of the appellant's interests. These searches also echo the appellant's contrived complaints to the special agent. We agree with the military judge that the appellant was likely responsible for these web searches.

The appellant argues that the evidence does not rule out the appellant's wife as the perpetrator and further argues that the presence of hydromorphone—not just hydrocodone—in RM's urine creates reasonable doubt. We disagree.

Even if we were to accept that the appellant's wife was involved in RM's poisoning, that fact alone would not exclude the appellant. We, like the military judge, find the circumstantial case against the appellant to be a compelling one, regardless of his wife's potential involvement.

As for the presence of hydromorphone, the record suggests that the presence of hydromorphone could be consistent with a theory that RM was poisoned by an administration of hydrocodone. Hydrocodone can metabolize to hydromorphone (the reverse is not true) and, given the lack of reliable studies that demonstrate how hydrocodone is metabolized in infants, the drug screening results in this case do not raise reasonable doubt. More significantly, the military judge found that RM was poisoned by both hydrocodone and hydromorphone. We, like the military judge, see no reason why evidence that RM was poisoned by two opiates creates doubt that the appellant poisoned RM with hydrocodone as alleged in the specifications of Charge I.

---

[63] Record at 301.

[64] *Id.* at 302.

[65] *Id.* at 306.

[66] Prosecution Exhibit 16.

After carefully reviewing the record of trial and considering all of the evidence in a light most favorable to the prosecution, we are convinced that a rational fact finder could have found the appellant committed aggravated assault against his son as found by the military judge. Furthermore, having considered the entirety of the record and weighing the evidence ourselves, we are convinced beyond a reasonable doubt of the appellant's guilt.

Although the military judge conditionally dismissed the child endangerment specification, we find that the same evidence supporting the aggravated assault convictions is legally and factually sufficient to support the military judge's guilty finding as child endangerment as well.

**C. Speedy trial**

The appellant alleges that the government violated his right to a speedy trial guaranteed him by Rule for Court-Martial 707. We disagree.

Whether an appellant received a speedy trial is a legal question we review de novo, "giv[ing] deference to a military judge's findings of fact on a speedy trial motion unless they are clearly erroneous[.]"[67]

An accused service member must be brought to trial within 120 days of preferral of charges.[68] While this was nominally accomplished in the appellant's case, the appellant argues that the convening authority dismissed his charges and re-preferred them in a subterfuge to avoid the requirements of R.C.M. 707.

Generally, the convening authority has unfettered discretion to dismiss charges that have been referred to a court-martial.[69] And dismissal of a charge results in a new 120-day speedy trial clock in the event the charge is re-preferred.[70] But we have held that where a convening authority's sole reason for dismissing a charge is to avoid the rule's requirement, the speedy trial clock is not reset.[71] This is the claim the appellant made at trial and renews on appeal.

We have considered the evidence, the parties' pleadings, and the military judge's detailed findings of fact. We find that the military judge's findings of

---

[67] *United States v. Samuels*, 65 M.J. 612, 613 (N-M Ct. Crim. App. 2007) (citing *United States v. Cooper*, 58 M.J. 54, 57 (C.A.A.F. 2003)).

[68] R.C.M. 707(a).

[69] *See United States v. Robinson,* 47 M.J. 506, 510 (N-M. Ct. Crim. App. 1997).

[70] *Id.*

[71] *Id.*

fact are well supported in the record and adopt them as our own. We will review the most pertinent facts here:

On 2 October 2014, charges were preferred against the appellant. Among these charges was one specification of attempted murder. The defense was responsible for 79 days of delay between preferral of charges and the dismissal of these charges on 5 February 2015. Taking into account the defense-requested exclusion of time, the dismissal occurred on day 47 of the speedy trial clock. The same day the convening authority dismissed the first set of charges, new charges were preferred, this time including not one but three specifications of attempted *premeditated* murder. An Article 32 investigation commenced on 13 February 2015 and concluded on 6 March 2015. Bad weather necessitated the delay in the investigation, and the convening authority excluded the period from 13 February to 6 March 2015 from the speedy trial calculation. On 23 March 2015, a charge and two specifications alleging child endangerment were preferred. The appellant's speedy trial clock stopped on 18 May 2015, the day of his arraignment.[72] After subtracting days the convening authority properly excluded, the appellant was brought to trial 81 days after the 5 February preferral.

Were we to find that the 5 February dismissal was a subterfuge and that the speedy trial clock should not be reset, we would conclude that the appellant was not brought to trial until 128 days after preferral of charges. But we agree with the military judge's finding that the appellant failed to present any evidence that the 5 February dismissal was a sham.

First, the fact that the convening authority decided to dismiss charges on day 47 hardly inclines us to find that the convening authority was engaged in a subterfuge. This was well before the convening authority or the government needed to be nervous about the speedy trial clock. The government provided good reasons for the dismissal and re-preferral. Most significantly, the new charges reflected a substantially different understanding of the case, reflected in two additional attempted murder specifications and the addition of the premeditation allegation. The government believed with good reason that these changes were not "minor changes" under Rule for Courts-Martial 603(d), and that the appellant could have objected to these changes unless they were preferred anew. The military judge also found that trial counsel wanted the charges dismissed and re-preferred in order to avoid confusing pen-and-ink changes and additions to the charge sheet.

---

[72] *See United States v. Doty*, 51 M.J. 464, 465 (C.A.A.F. 1999).

In sum, we are convinced that the 5 February dismissal was not a subterfuge to game the speedy trial clock, and that the appellant was brought to trial within 120 days of preferral.

**D. Expert testimony**

In this AOE the appellant personally asserts that the military judge erred by considering the testimony of Dr. CMK, a forensic toxicologist, when she testified to a "novel scientific theory."[73] The theory in question concerned whether RM had been poisoned by both hydrocodone and hydromorphone.

Hydromorphone is a minor metabolite of hydrocodone, meaning that the process of metabolizing hydrocodone produces hydromorphone. It is therefore unsurprising to find that a subject who has ingested only hydrocodone has tested positive for both hydrocodone and hydromorphone. Indeed RM, whom the government suspected had been poisoned by hydrocodone, tested positive for both hydrocodone and hydromorphone. But during cross-examination, Dr. CMK admitted that the ratio of hydrocodone to hydromorphone present in RM's sample gave her pause.

Dr. CMK testified that in adults she would expect to see relatively low levels of hydromorphone compared to hydrocodone in a urine sample when the hydromorphone is present solely because the subject is metabolizing hydrocodone. Dr. CMK testified that she might expect to see a ratio of 1:10 or 1:5 between hydromorphone and hydrocodone in such a case. In RM's sample, more hydromorphone was present than hydrocodone. Dr. CMK could not explain this result. But she did caution that infants do not metabolize medications in the same ways as adults. She testified in quite technical terms that differences in infants' liver enzymes could explain different metabolic processes in infants and might account for the unexpected ratio of hydromorphone to hydrocodone found in RM's urine. Ultimately, Dr. CMK testified that she could not determine whether RM's urine test reflected ingestion of hydrocodone *and* hydromorphone or hydrocodone alone. She further testified that no scientific studies had been—or could be—conducted on infants to determine how they metabolize opiates.

At this point, TDC objected to Dr. CMK's testimony, specifically "her conclusion about this being one drug based on this theory."[74]

After initially deferring his ruling, the military judge overruled the objection. He considered Dr. CMK's testimony about the possibility that differences in infants' metabolic processes could account for the relatively

---

[73] Appellant's Brief of 21 Apr 2017 at 28.

[74] Record at 452.

high levels of hydromorphone in RM's results, "but [he] also considered the strength of the science behind it."[75] The appellant alleges that Dr. CMK's theory that the difference between infants' and adults' metabolic processes could explain why RM's results might have been caused by hydrocodone alone should have been excluded as unreliable under *Daubert v. Merrell Dow Pharmaceuticals*.[76]

We review a military judge's decision to admit testimony under *Daubert* for an abuse of discretion.[77]

This AOE is without merit. First, we have considered Dr. CMK's testimony under the standard of *Daubert* and its progeny. We find that the military judge did not abuse his discretion by considering Dr. CMK's testimony about the differences between infants' and adult's capacity to metabolize medications. Dr. CMK's testimony, properly understood, related not to what she knew but rather to what she *did not* know. Dr. CMK was unable to conclude with certainty that infants metabolize hydrocodone in the same way as adults because there was insufficient evidence to support such a conclusion. She testified expertly and helpfully about the differences between adults' and infants' metabolic processes and explained why she could not be sure, based on RM's urine screen, that RM had been poisoned by both hydrocodone and hydromorphone.

Even if the military judge had erred, we would not grant relief. The military judge did not ultimately accept the proposition that RM had only been poisoned by hydrocodone and that hydromorphone appeared in his system only as a result of metabolic processes. Rather, he found that RM had been poisoned by both hydrocodone and hydromorphone. In other words, after considering the complained of testimony, the military judge did not accept it. This eliminates the possibility that the appellant was prejudiced by the disputed portion of Dr. CMK's testimony.

### F. Petition for a new trial

The appellant personally petitioned for a new trial. He alleges that RM's treating physicians, Dr. NC and Dr. DD, falsified medical records, and that the trial counsel withheld information regarding these doctors' false entries from the court-martial. The appellant also claims to have newly discovered that RM's social security number and ethnicity were erroneously recorded on an appellate exhibit.

---

[75] *Id.* at 789.

[76] 509 U.S. at 579.

[77] *See United States v. Flesher*, 73 M.J. 303, 311 (C.A.A.F. 2014).

 Petitions for a new trial are generally disfavored and should be granted only to avoid a manifestly unjust result.[78]  In considering a motion for a new trial for fraud on the court below, we ask whether a fraud on the court-martial substantially contributed to a finding of guilty or to the sentence.[79]

A new trial for newly discovered evidence should only be granted when:

> (1) The evidence was discovered after the trial;

> (2) The evidence is not such that it would have been discovered by the petitioner at the time of trial in the exercise of due diligence; and

> (3) The newly discovered evidence, if considered by a court-martial in the light of all other pertinent evidence, would probably produce a substantially more favorable result for the accused.[80]

We find no evidence that any person committed a fraud on the court-martial. The appellant points to no new relevant evidence that could not have been discovered at the time of trial though due diligence. The petition is without merit.

### III. CONCLUSION

The findings and sentence are affirmed. The petition for a new trial is denied.

Senior Judge HUTCHISON and Judge PRICE concur.

For the Court


R.H. TROIDL
Clerk of Court

---

[78] *See United States v. Brooks*, 49 M.J. 64, 68 (C.A.A.F. 1998); *United States v. Williams*, 37 M.J. 352, 357 (C.M.A. 1993).

[79] R.C.M. 1210(f)(3).

[80] R.C.M. 1210(f)(2).